## IN RE GAULT ET AL.

No. 116.   Argued December 6, 1966.—Decided May 15, 1967.

2

*Norman Dorsen* argued the cause for appellants. With him on the brief were *Melvin L. Wulf, Amelia D. Lewis* and *Daniel A. Rezneck.*

*Frank A. Parks,* Assistant Attorney General of Arizona, argued the cause for appellee, *pro hac vice,* by special leave of Court. With him on the brief was *Darrell F. Smith,* Attorney General.

*Merritt W. Green* argued the cause for the Ohio Association of Juvenile Court Judges, as *amicus curiae,* urging affirmance. With him on the brief was *Leo G. Chimo.*

The Kansas Association of Probate and Juvenile Judges joined the appellee's brief and the brief of the Ohio Association of Juvenile Court Judges.

Briefs of *amici curiae,* urging reversal, were filed by *L. Michael Getty, James J. Doherty* and *Marshall J. Hartman* for the National Legal Aid and Defender Association, and by *Edward Q. Carr, Jr.,* and *Nanette Dembitz* for the Legal Aid Society and Citizens' Committee for Children of New York, Inc.

*Nicholas N. Kittrie* filed a brief for the American Parents Committee, as *amicus curiae.*

Mr. Justice Fortas delivered the opinion of the Court.

This is an appeal under 28 U. S. C. § 1257 (2) from a judgment of the Supreme Court of Arizona affirming the

4

dismissal of a petition for a writ of habeas corpus. 99 Ariz. 181, 407 P. 2d 760 (1965). The petition sought the release of Gerald Francis Gault, appellants' 15-year-old son, who had been committed as a juvenile delinquent to the State Industrial School by the Juvenile Court of Gila County, Arizona. The Supreme Court of Arizona affirmed dismissal of the writ against various arguments which included an attack upon the constitutionality of the Arizona Juvenile Code because of its alleged denial of procedural due process rights to juveniles charged with being "delinquents." The court agreed that the constitutional guarantee of due process of law is applicable in such proceedings. It held that Arizona's Juvenile Code is to be read as "impliedly" implementing the "due process concept." It then proceeded to identify and describe "the particular elements which constitute due process in a juvenile hearing." It concluded that the proceedings ending in commitment of Gerald Gault did not offend those requirements. We do not agree, and we reverse. We begin with a statement of the facts.

I.

On Monday, June 8, 1964, at about 10 a. m., Gerald Francis Gault and a friend, Ronald Lewis, were taken into custody by the Sheriff of Gila County. Gerald was then still subject to a six months' probation order which had been entered on February 25, 1964, as a result of his having been in the company of another boy who had stolen a wallet from a lady's purse. The police action on June 8 was taken as the result of a verbal complaint by a neighbor of the boys, Mrs. Cook, about a telephone call made to her in which the caller or callers made lewd or indecent remarks. It will suffice for purposes of this opinion to say that the remarks or questions put to her were of the irritatingly offensive, adolescent, sex variety.

At the time Gerald was picked up, his mother and father were both at work. No notice that Gerald was being taken into custody was left at the home. No other steps were taken to advise them that their son had, in effect, been arrested. Gerald was taken to the Children's Detention Home. When his mother arrived home at about 6 o'clock, Gerald was not there. Gerald's older brother was sent to look for him at the trailer home of the Lewis family. He apparently learned then that Gerald was in custody. He so informed his mother. The two of them went to the Detention Home. The deputy probation officer, Flagg, who was also superintendent of the Detention Home, told Mrs. Gault "why Jerry was there" and said that a hearing would be held in Juvenile Court at 3 o'clock the following day, June 9.

Officer Flagg filed a petition with the court on the hearing day, June 9, 1964. It was not served on the Gaults. Indeed, none of them saw this petition until the habeas corpus hearing on August 17, 1964. The petition was entirely formal. It made no reference to any factual basis for the judicial action which it initiated. It recited only that "said minor is under the age of eighteen years, and is in need of the protection of this Honorable Court; [and that] said minor is a delinquent minor." It prayed for a hearing and an order regarding "the care and custody of said minor." Officer Flagg executed a formal affidavit in support of the petition.

On June 9, Gerald, his mother, his older brother, and Probation Officers Flagg and Henderson appeared before the Juvenile Judge in chambers. Gerald's father was not there. He was at work out of the city. Mrs. Cook, the complainant, was not there. No one was sworn at this hearing. No transcript or recording was made. No memorandum or record of the substance of the proceedings was prepared. Our information about the proceed-

ings and the subsequent hearing on June 15, derives entirely from the testimony of the Juvenile Court Judge,[1] Mr. and Mrs. Gault and Officer Flagg at the habeas corpus proceeding conducted two months later. From this, it appears that at the June 9 hearing Gerald was questioned by the judge about the telephone call. There was conflict as to what he said. His mother recalled that Gerald said he only dialed Mrs. Cook's number and handed the telephone to his friend, Ronald. Officer Flagg recalled that Gerald had admitted making the lewd remarks. Judge McGhee testified that Gerald "admitted making one of these [lewd] statements." At the conclusion of the hearing, the judge said he would "think about it." Gerald was taken back to the Detention Home. He was not sent to his own home with his parents. On June 11 or 12, after having been detained since June 8, Gerald was released and driven home.[2] There is no explanation in the record as to why he was kept in the Detention Home or why he was released. At 5 p. m. on the day of Gerald's release, Mrs. Gault received a note signed by Officer Flagg. It was on plain paper, not letterhead. Its entire text was as follows:

"Mrs. Gault:

"Judge McGHEE has set Monday June 15, 1964 at 11:00 A. M. as the date and time for further Hearings on Gerald's delinquency

"/s/Flagg"

---

[1] Under Arizona law, juvenile hearings are conducted by a judge of the Superior Court, designated by his colleagues on the Superior Court to serve as Juvenile Court Judge. Arizona Const., Art. 6, § 15; Arizona Revised Statutes (hereinafter ARS) §§ 8–201, 8–202.

[2] There is a conflict between the recollection of Mrs. Gault and that of Officer Flagg. Mrs. Gault testified that Gerald was released on Friday, June 12, Officer Flagg that it had been on Thursday, June 11. This was from memory; he had no record, and the note hereafter referred to was undated.

At the appointed time on Monday, June 15, Gerald, his father and mother, Ronald Lewis and his father, and Officers Flagg and Henderson were present before Judge McGhee. Witnesses at the habeas corpus proceeding differed in their recollections of Gerald's testimony at the June 15 hearing. Mr. and Mrs. Gault recalled that Gerald again testified that he had only dialed the number and that the other boy had made the remarks. Officer Flagg agreed that at this hearing Gerald did not admit making the lewd remarks.[3] But Judge McGhee recalled that "there was some admission again of some of the lewd statements. He—he didn't admit any of the more serious lewd statements."[4] Again, the complainant, Mrs. Cook, was not present. Mrs. Gault asked that Mrs. Cook be present "so she could see which boy that done the talking, the dirty talking over the phone." The Juvenile Judge said "she didn't have to be present at that hearing." The judge did not speak to Mrs. Cook or communicate with her at any time. Probation Officer Flagg had talked to her once—over the telephone on June 9.

At this June 15 hearing a "referral report" made by the probation officers was filed with the court, although not disclosed to Gerald or his parents. This listed the charge as "Lewd Phone Calls." At the conclusion of the hearing, the judge committed Gerald as a juvenile delinquent to the State Industrial School "for the period of his minority [that is, until 21], unless sooner dis-

---

[3] Officer Flagg also testified that Gerald had not, when questioned at the Detention Home, admitted having made any of the lewd statements, but that each boy had sought to put the blame on the other. There was conflicting testimony as to whether Ronald had accused Gerald of making the lewd statements during the June 15 hearing.

[4] Judge McGhee also testified that Gerald had not denied "certain statements" made to him at the hearing by Officer Henderson.

8

charged by due process of law." An order to that effect was entered. It recites that "after a full hearing and due deliberation the Court finds that said minor is a delinquent child, and that said minor is of the age of 15 years."

No appeal is permitted by Arizona law in juvenile cases. On August 3, 1964, a petition for a writ of habeas corpus was filed with the Supreme Court of Arizona and referred by it to the Superior Court for hearing.

At the habeas corpus hearing on August 17, Judge McGhee was vigorously cross-examined as to the basis for his actions. He testified that he had taken into account the fact that Gerald was on probation. He was asked "under what section of . . . the code you found the boy delinquent?"

His answer is set forth in the margin.[5] In substance, he concluded that Gerald came within ARS § 8–201–6 (a), which specifies that a "delinquent child" includes one "who has violated a law of the state or an ordinance or regulation of a political subdivision thereof." The law which Gerald was found to have violated is ARS § 13–377. This section of the Arizona Criminal Code provides that a person who "in the presence or hearing of any woman or child . . . uses vulgar, abusive or obscene language, is guilty of a misdemeanor. . . ." The penalty specified in the Criminal Code, which would

---

[5] "Q. All right. Now, Judge, would you tell me under what section of the law or tell me under what section of—of the code you found the boy delinquent?

"A. Well, there is a—I think it amounts to disturbing the peace. I can't give you the section, but I can tell you the law, that when one person uses lewd language in the presence of another person, that it can amount to—and I consider that when a person makes it over the phone, that it is considered in the presence, I might be wrong, that is one section. The other section upon which I consider the boy delinquent is Section 8–201, Subsection (d), habitually involved in immoral matters."

apply to an adult, is $5 to $50, or imprisonment for not more than two months. The judge also testified that he acted under ARS § 8–201–6 (d) which includes in the definition of a "delinquent child" one who, as the judge phrased it, is "habitually involved in immoral matters." [6]

Asked about the basis for his conclusion that Gerald was "habitually involved in immoral matters," the judge testified, somewhat vaguely, that two years earlier, on July 2, 1962, a "referral" was made concerning Gerald, "where the boy had stolen a baseball glove from another boy and lied to the Police Department about it." The judge said there was "no hearing," and "no accusation" relating to this incident, "because of lack of material foundation." But it seems to have remained in his mind as a relevant factor. The judge also testified that Gerald had admitted making other nuisance phone calls in the past which, as the judge recalled the boy's testimony, were "silly calls, or funny calls, or something like that."

The Superior Court dismissed the writ, and appellants sought review in the Arizona Supreme Court. That court stated that it considered appellants' assignments of error as urging (1) that the Juvenile Code, ARS § 8–201 to § 8–239, is unconstitutional because it does not require that parents and children be apprised of the specific charges, does not require proper notice of a hearing, and does not provide for an appeal; and (2) that the proceed-

---

[6] ARS § 8–201–6, the section of the Arizona Juvenile Code which defines a delinquent child, reads:

" 'Delinquent child' includes:

"(a) A child who has violated a law of the state or an ordinance or regulation of a political subdivision thereof.

"(b) A child who, by reason of being incorrigible, wayward or habitually disobedient, is uncontrolled by his parent, guardian or custodian.

"(c) A child who is habitually truant from school or home.

"(d) A child who habitually so deports himself as to injure or endanger the morals or health of himself or others."

ings and order relating to Gerald constituted a denial of due process of law because of the absence of adequate notice of the charge and the hearing; failure to notify appellants of certain constitutional rights including the rights to counsel and to confrontation, and the privilege against self-incrimination; the use of unsworn hearsay testimony; and the failure to make a record of the proceedings. Appellants further asserted that it was error for the Juvenile Court to remove Gerald from the custody of his parents without a showing and finding of their unsuitability, and alleged a miscellany of other errors under state law.

The Supreme Court handed down an elaborate and wide-ranging opinion affirming dismissal of the writ and stating the court's conclusions as to the issues raised by appellants and other aspects of the juvenile process. In their jurisdictional statement and brief in this Court, appellants do not urge upon us all of the points passed upon by the Supreme Court of Arizona. They urge that we hold the Juvenile Code of Arizona invalid on its face or as applied in this case because, contrary to the Due Process Clause of the Fourteenth Amendment, the juvenile is taken from the custody of his parents and committed to a state institution pursuant to proceedings in which the Juvenile Court has virtually unlimited discretion, and in which the following basic rights are denied:

1. Notice of the charges;
2. Right to counsel;
3. Right to confrontation and cross-examination;
4. Privilege against self-incrimination;
5. Right to a transcript of the proceedings; and
6. Right to appellate review.

We shall not consider other issues which were passed upon by the Supreme Court of Arizona. We emphasize

that we indicate no opinion as to whether the decision of that court with respect to such other issues does or does not conflict with requirements of the Federal Constitution.[7]

[7] For example, the laws of Arizona allow arrest for a misdemeanor only if a warrant is obtained or if it is committed in the presence of the officer. ARS § 13–1403. The Supreme Court of Arizona held that this is inapplicable in the case of juveniles. See ARS § 8–221 which relates specifically to juveniles. But compare *Two Brothers and a Case of Liquor*, Juv. Ct. D. C., Nos. 66–2652–J, 66–2653–J, December 28, 1966 (opinion of Judge Ketcham); Standards for Juvenile and Family Courts, Children's Bureau Pub. No. 437–1966, p. 47 (hereinafter cited as Standards); New York Family Court Act § 721 (1963) (hereinafter cited as N. Y. Family Court Act).

The court also held that the judge may consider hearsay if it is "of a kind on which reasonable men are accustomed to rely in serious affairs." But compare Note, Juvenile Delinquents: The Police, State Courts, and Individualized Justice, 79 Harv. L. Rev. 775, 794–795 (1966) (hereinafter cited as Harvard Law Review Note):

"The informality of juvenile court hearings frequently leads to the admission of hearsay and unsworn testimony. It is said that 'close adherence to the strict rules of evidence might prevent the court from obtaining important facts as to the child's character and condition which could only be to the child's detriment.' The assumption is that the judge will give normally inadmissible evidence only its proper weight. It is also declared in support of these evidentiary practices that the juvenile court is not a criminal court, that the importance of the hearsay rule has been overestimated, and that allowing an attorney to make 'technical objections' would disrupt the desired informality of the proceedings. But to the extent that the rules of evidence are not merely technical or historical, but like the hearsay rule have a sound basis in human experience, they should not be rejected in any judicial inquiry. Juvenile court judges in Los Angeles, Tucson, and Wisconsin Rapids, Wisconsin report that they are satisfied with the operation of their courts despite application of unrelaxed rules of evidence." (Footnotes omitted.)

It ruled that the correct burden of proof is that "the juvenile judge must be persuaded by clear and convincing evidence that the infant has committed the alleged delinquent act." Compare the

## II.

The Supreme Court of Arizona held that due process of law is requisite to the constitutional validity of proceedings in which a court reaches the conclusion that a juvenile has been at fault, has engaged in conduct prohibited by law, or has otherwise misbehaved with the consequence that he is committed to an institution in which his freedom is curtailed. This conclusion is in accord with the decisions of a number of courts under both federal and state constitutions.[8]

This Court has not heretofore decided the precise question. In *Kent v. United States,* 383 U. S. 541 (1966), we considered the requirements for a valid waiver of the "exclusive" jurisdiction of the Juvenile Court of the District of Columbia so that a juvenile could be tried in the adult criminal court of the District. Although our decision turned upon the language of the statute, we emphasized the necessity that "the basic requirements of due process and fairness" be satisfied in such proceedings.[9] *Haley v. Ohio,* 332 U. S. 596 (1948), involved the admissibility, in a state criminal court of general jurisdiction, of a confession by a 15-year-old boy. The Court held that the Fourteenth Amendment applied to

---

"preponderance of the evidence" test, N. Y. Family Court Act § 744 (where maximum commitment is three years, §§ 753, 758). Cf. Harvard Law Review Note, p. 795.

[8] See, *e. g., In the Matters of Gregory W. and Gerald S.,* 19 N. Y. 2d 55, 224 N. E. 2d 102 (1966); *In the Interests of Carlo and Stasilowicz,* 48 N. J. 224, 225 A. 2d 110 (1966); *People v. Dotson,* 46 Cal. 2d 891, 299 P. 2d 875 (1956); *Pee v. United States,* 107 U. S. App. D. C. 47, 274 F. 2d 556 (1959); *Wissenburg v. Bradley,* 209 Iowa 813, 229 N. W. 205 (1930); *Bryant v. Brown,* 151 Miss. 398, 118 So. 184 (1928); *Dendy v. Wilson,* 142 Tex. 460, 179 S. W. 2d 269 (1944); *Application of Johnson,* 178 F. Supp. 155 (D. C. N. J. 1957).

[9] 383 U. S., at 553.

prohibit the use of the coerced confession. MR. JUSTICE DOUGLAS said, "Neither man nor child can be allowed to stand condemned by methods which flout constitutional requirements of due process of law." [10]  To the same effect is *Gallegos* v. *Colorado*, 370 U. S. 49 (1962). Accordingly, while these cases relate only to restricted aspects of the subject, they unmistakably indicate that, whatever may be their precise impact, neither the Fourteenth Amendment nor the Bill of Rights is for adults alone.

We do not in this opinion consider the impact of these constitutional provisions upon the totality of the relationship of the juvenile and the state. We do not even consider the entire process relating to juvenile "delinquents." For example, we are not here concerned with the procedures or constitutional rights applicable to the pre-judicial stages of the juvenile process, nor do we direct our attention to the post-adjudicative or dispositional process. See note 48, *infra*. We consider only the problems presented to us by this case. These relate to the proceedings by which a determination is made as to whether a juvenile is a "delinquent" as a result of alleged misconduct on his part, with the consequence that he may be committed to a state institution. As to these proceedings, there appears to be little current dissent from the proposition that the Due Process Clause has a role to play.[11]  The problem is to ascertain

_____

[10] 332 U. S., at 601 (opinion for four Justices).

[11] See Report by the President's Commission on Law Enforcement and Administration of Justice, "The Challenge of Crime in a Free Society" (1967) (hereinafter cited as Nat'l Crime Comm'n Report), pp. 81, 85–86; Standards, p. 71; Gardner, The Kent Case and the Juvenile Court: A Challenge to Lawyers, 52 A. B. A. J. 923 (1966); Paulsen, Fairness to the Juvenile Offender, 41 Minn. L. Rev. 547 (1957); Ketcham, The Legal Renaissance in the Juvenile Court, 60 Nw. U. L. Rev. 585 (1965); Allen, The Borderland of Criminal

the precise impact of the due process requirement upon such proceedings.

From the inception of the juvenile court system, wide differences have been tolerated—indeed insisted upon— between the procedural rights accorded to adults and those of juveniles. In practically all jurisdictions, there are rights granted to adults which are withheld from juveniles. In addition to the specific problems involved in the present case, for example, it has been held that the juvenile is not entitled to bail, to indictment by grand jury, to a public trial or to trial by jury.[12]  It is frequent practice that rules governing the arrest and interrogation of adults by the police are not observed in the case of  juveniles.[13]

The history and theory underlying this development are well-known, but a recapitulation is necessary for purposes of this opinion.  The Juvenile Court movement began in this country at the end of the last century. From the juvenile court statute adopted in Illinois in 1899, the system has spread to every State in the Union, the District of Columbia, and Puerto Rico.[14]  The con-

Justice (1964), pp. 19–23; Harvard Law Review Note, p. 791; Note, Rights and Rehabilitation in the Juvenile Courts, 67 Col. L. Rev. 281 (1967); Comment, Criminal Offenders in the Juvenile Court: More Brickbats and Another Proposal, 114 U. Pa. L. Rev. 1171 (1966).

[12] See Kent v. United States, 383 U. S. 541, 555 and n. 22 (1966).

[13] See n. 7, supra.

[14] See National Council of Juvenile Court Judges, Directory and Manual (1964), p. 1. The number of Juvenile Judges as of 1964 is listed as 2,987, of whom 213 are full-time Juvenile Court Judges. Id., at 305. The Nat'l Crime Comm'n Report indicates that half of these judges have no undergraduate degree, a fifth have no college education at all, a fifth are not members of the bar, and three-quarters devote less than one-quarter of their time to juvenile matters. See also McCune, Profile of the Nation's Juvenile Court Judges (monograph, George Washington University, Center for the Behavioral Sciences, 1965), which is a detailed statistical study of Juvenile

stitutionality of Juvenile Court laws has been sustained in over 40 jurisdictions against a variety of attacks.[15]

The early reformers were appalled by adult procedures and penalties, and by the fact that children could be given long prison sentences and mixed in jails with hardened criminals. They were profoundly convinced that society's duty to the child could not be confined by the concept of justice alone. They believed that society's role was not to ascertain whether the child was "guilty" or "innocent," but "What is he, how has he become what he is, and what had best be done in his interest and in the interest of the state to save him from a downward career."[16] The child—essentially good, as they saw it—was to be made "to feel that he is the object of [the state's] care and solicitude,"[17] not that he was under arrest or on trial. The rules of criminal procedure were therefore altogether inapplicable. The apparent rigidities, technicalities, and harshness which they observed in both substantive and procedural criminal law were therefore to be discarded. The idea of crime and punishment was to be abandoned. The child was

Court Judges, and indicates additionally that about a quarter of these judges have no law school training at all. About one-third of all judges have no probation and social work staff available to them; between eighty and ninety percent have no available psychologist or psychiatrist. *Ibid.* It has been observed that while "good will, compassion, and similar virtues are . . . admirably prevalent throughout the system . . . expertise, the keystone of the whole venture, is lacking." Harvard Law Review Note, p. 809. In 1965, over 697,000 delinquency cases (excluding traffic) were disposed of in these courts, involving some 601,000 children, or 2% of all children between 10 and 17. Juvenile Court Statistics—1965, Children's Bureau Statistical Series No. 85 (1966), p. 2.

[15] See Paulsen, Kent v. United States: The Constitutional Context of Juvenile Cases, 1966 Sup. Ct. Review 167, 174.

[16] Julian Mack, The Juvenile Court, 23 Harv. L. Rev. 104, 119–120 (1909).

[17] *Id.*, at 120.

to be "treated" and "rehabilitated" and the procedures, from apprehension through institutionalization, were to be "clinical" rather than punitive.

These results were to be achieved, without coming to conceptual and constitutional grief, by insisting that the proceedings were not adversary, but that the state was proceeding as *parens patriae*.[18] The Latin phrase proved to be a great help to those who sought to rationalize the exclusion of juveniles from the constitutional scheme; but its meaning is murky and its historic credentials are of dubious relevance. The phrase was taken from chancery practice, where, however, it was used to describe the power of the state to act *in loco parentis* for the purpose of protecting the property interests and the person of the child.[19] But there is no trace of the doctrine in the history of criminal jurisprudence. At common law, children under seven were considered incapable of possessing criminal intent. Beyond that age, they were subjected to arrest, trial, and in theory to punishment like adult offenders.[20] In these old days,

---

[18] *Id.*, at 109; Paulsen, *op. cit. supra*, n. 15, at 173–174. There seems to have been little early constitutional objection to the special procedures of juvenile courts. But see Waite, How Far Can Court Procedure Be Socialized Without Impairing Individual Rights, 12 J. Crim. L. & Criminology 339, 340 (1922): "The court which must direct its procedure even apparently to do something *to* a child because of what he *has done,* is parted from the court which is avowedly concerned only with doing something *for* a child because of what he *is* and *needs,* by a gulf too wide to be bridged by any humanity which the judge may introduce into his hearings, or by the habitual use of corrective rather than punitive methods after conviction."

[19] Paulsen, *op. cit. supra*, n. 15, at 173; Hurley, Origin of the Illinois Juvenile Court Law, in The Child, The Clinic, and the Court (1925), pp. 320, 328.

[20] Julian Mack, The Chancery Procedure in the Juvenile Court, in The Child, The Clinic, and the Court (1925), p. 310.

the state was not deemed to have authority to accord them fewer procedural rights than adults.

The right of the state, as *parens patriae,* to deny to the child procedural rights available to his elders was elaborated by the assertion that a child, unlike an adult, has a right "not to liberty but to custody." He can be made to attorn to his parents, to go to school, etc. If his parents default in effectively performing their custodial functions—that is, if the child is "delinquent"—the state may intervene. In doing so, it does not deprive the child of any rights, because he has none. It merely provides the "custody" to which the child is entitled.[21] On this basis, proceedings involving juveniles were described as "civil" not "criminal" and therefore not subject to the requirements which restrict the state when it seeks to deprive a person of his liberty.[22]

Accordingly, the highest motives and most enlightened impulses led to a peculiar system for juveniles, unknown to our law in any comparable context. The constitutional and theoretical basis for this peculiar system is—to say the least—debatable. And in practice, as we remarked in the *Kent* case, *supra,* the results have

---

[21] See, *e. g.,* Shears, Legal Problems Peculiar to Children's Courts, 48 A. B. A. J. 719, 720 (1962) ("The basic right of a juvenile is not to liberty but to custody. He has the right to have someone take care of him, and if his parents do not afford him this custodial privilege, the law must do so."); *Ex parte Crouse,* 4 Whart. 9, 11 (Sup. Ct. Pa. 1839); *Petition of Ferrier,* 103 Ill. 367, 371–373 (1882).

[22] The Appendix to the opinion of Judge Prettyman in *Pee* v. *United States,* 107 U. S. App. D. C. 47, 274 F. 2d 556 (1959), lists authority in 51 jurisdictions to this effect. Even rules required by due process in civil proceedings, however, have not generally been deemed compulsory as to proceedings affecting juveniles. For example, constitutional requirements as to notice of issues, which would commonly apply in civil cases, are commonly disregarded in juvenile proceedings, as this case illustrates.

not been entirely satisfactory.[23]  Juvenile Court history has again demonstrated that unbridled discretion, however benevolently motivated, is frequently a poor substitute for principle and procedure.  In 1937, Dean Pound wrote: "The powers of the Star Chamber were a trifle in comparison with those of our juvenile courts . . . ."[24] The absence of substantive standards has not necessarily meant that children receive careful, compassionate, individualized treatment.  The absence of procedural rules based upon constitutional principle has not always produced fair, efficient, and effective procedures.  Departures from established principles of due process have fre-

---

[23] "There is evidence . . . that there may be grounds for concern that the child receives the worst of both worlds: that he gets neither the protections accorded to adults nor the solicitous care and regenerative treatment postulated for children."  383 U. S., at 556, citing Handler, The Juvenile Court and the Adversary System: Problems of Function and Form, 1965 Wis. L. Rev. 7; Harvard Law Review Note; and various congressional materials set forth in 383 U. S., at 546, n. 5.

On the other hand, while this opinion and much recent writing concentrate upon the failures of the Juvenile Court system to live up to the expectations of its founders, the observation of the Nat'l Crime Comm'n Report should be kept in mind:

"Although its shortcomings are many and its results too often disappointing, the juvenile justice system in many cities is operated by people who are better educated and more highly skilled, can call on more and better facilities and services, and has more ancillary agencies to which to refer its clientele than its adult counterpart." Id., at 78.

[24] Foreword to Young, Social Treatment in Probation and Delinquency (1937), p. xxvii.  The 1965 Report of the United States Commission on Civil Rights, "Law Enforcement—A Report on Equal Protection in the South," pp. 80–83, documents numerous instances in which "local authorities used the broad discretion afforded them by the absence of safeguards [in the juvenile process]" to punish, intimidate, and obstruct youthful participants in civil rights demonstrations.  See also Paulsen, Juvenile Courts, Family Courts, and the Poor Man, 54 Calif. L. Rev. 694, 707–709 (1966).

quently resulted not in enlightened procedure, but in arbitrariness. The Chairman of the Pennsylvania Council of Juvenile Court Judges has recently observed: "Unfortunately, loose procedures, high-handed methods and crowded court calendars, either singly or in combination, all too often, have resulted in depriving some juveniles of fundamental rights that have resulted in a denial of due process." [25]

Failure to observe the fundamental requirements of due process has resulted in instances, which might have been avoided, of unfairness to individuals and inadequate

---

[25] Lehman, A Juvenile's Right to Counsel in a Delinquency Hearing, 17 Juvenile Court Judges Journal 53, 54 (1966).

Compare the observation of the late Arthur T. Vanderbilt, Chief Justice of the Supreme Court of New Jersey, in a foreword to Virtue, Basic Structure for Children's Services in Michigan (1953), p. x:

"In their zeal to care for children neither juvenile judges nor welfare workers can be permitted to violate the Constitution, especially the constitutional provisions as to due process that are involved in moving a child from its home. The indispensable elements of due process are: first, a tribunal with jurisdiction; second, notice of a hearing to the proper parties; and finally, a fair hearing. All three must be present if we are to treat the child as an individual human being and not to revert, in spite of good intentions, to the more primitive days when he was treated as a chattel."

We are warned that the system must not "degenerate into a star chamber proceeding with the judge imposing his own particular brand of culture and morals on indigent people . . . ." Judge Marion G. Woodward, letter reproduced in 18 Social Service Review 366, 368 (1944). Doctor Bovet, the Swiss psychiatrist, in his monograph for the World Health Organization, Psychiatric Aspects of Juvenile Delinquency (1951), p. 79, stated that: "One of the most definite conclusions of this investigation is that few fields exist in which more serious coercive measures are applied, on such flimsy objective evidence, than in that of juvenile delinquency." We are told that "The judge as amateur psychologist, experimenting upon the unfortunate children who must appear before him, is neither an attractive nor a convincing figure." Harvard Law Review Note, at 808.

20

or inaccurate findings of fact and unfortunate prescriptions of remedy. Due process of law is the primary and indispensable foundation of individual freedom. It is the basic and essential term in the social compact which defines the rights of the individual and delimits the powers which the state may exercise.[26]   As Mr. Justice

[26] The impact of denying fundamental procedural due process to juveniles involved in "delinquency" charges is dramatized by the following considerations: (1) In 1965, persons under 18 accounted for about one-fifth of all arrests for serious crimes (Nat'l Crime Comm'n Report, p. 55) and over half of all arrests for serious property offenses (*id.*, at 56), and in the same year some 601,000 children under 18, or 2% of all children between 10 and 17, came before juvenile courts (Juvenile Court Statistics—1965, Children's Bureau Statistical Series No. 85 (1966) p. 2). About one out of nine youths will be referred to juvenile court in connection with a delinquent act (excluding traffic offenses) before he is 18 (Nat'l Crime Comm'n Report, p. 55). Cf. also Wheeler & Cottrell, Juvenile Delinquency— Its Prevention and Control (Russell Sage Foundation, 1965), p. 2; Report of the President's Commission on Crime in the District of Columbia (1966) (hereinafter cited as D. C. Crime Comm'n Report), p. 773. Furthermore, most juvenile crime apparently goes undetected or not formally punished. Wheeler & Cottrell, *supra*, observe that "[A]lmost all youngsters have committed at least one of the petty forms of theft and vandalism in the course of their adolescence." *Id.*, at 28–29. See also Nat'l Crime Comm'n Report, p. 55, where it is stated that "self-report studies reveal that perhaps 90 percent of all young people have committed at least one act for which they could have been brought to juvenile court." It seems that the rate of juvenile delinquency is also steadily rising. See Nat'l Crime Comm'n Report, p. 56; Juvenile Court Statistics, *supra*, pp. 2–3. (2) In New York, where most juveniles are represented by counsel (see n. 69, *infra*) and substantial procedural rights are afforded (see, *e. g.*, nn. 80, 81, 99, *infra*), out of a fiscal year 1965–1966 total of 10,755 juvenile proceedings involving boys, 2,242 were dismissed for failure of proof at the fact-finding hearing; for girls, the figures were 306 out of a total of 1,051. New York Judicial Conference, Twelfth Annual Report, pp. 314, 316 (1967). (3) In about one-half of the States, a juvenile may be transferred to an adult penal institution after a juvenile court has found him "delinquent" (Delin-

Frankfurter has said: "The history of American freedom is, in no small measure, the history of procedure." [27] But in addition, the procedural rules which have been fashioned from the generality of due process are our best instruments for the distillation and evaluation of essential facts from the conflicting welter of data that life and our adversary methods present. It is these instruments of due process which enhance the possibility that truth will emerge from the confrontation of opposing versions and conflicting data. "Procedure is to law what 'scientific method' is to science." [28]

It is claimed that juveniles obtain benefits from the special procedures applicable to them which more than offset the disadvantages of denial of the substance of normal due process. As we shall discuss, the observance of due process standards, intelligently and not ruthlessly administered, will not compel the States to abandon or displace any of the substantive benefits of the juvenile process. [29] But it is important, we think, that the claimed benefits of the juvenile process should be candidly appraised. Neither sentiment nor folklore should cause us to shut our eyes, for example, to such startling findings

---

quent Children in Penal Institutions, Children's Bureau Pub. No. 415–1964, p. 1). (4) In some jurisdictions a juvenile may be subjected to criminal prosecution for the same offense for which he has served under a juvenile court commitment. However, the Texas procedure to this effect has recently been held unconstitutional by a federal district court judge, in a habeas corpus action. *Sawyer* v. *Hauck*, 245 F. Supp. 55 (D. C. W. D. Tex. 1965). (5) In most of the States the juvenile may end in criminal court through waiver (Harvard Law Review Note, p. 793).

[27] *Malinski* v. *New York*, 324 U. S. 401, 414 (1945) (separate opinion).

[28] Foster, Social Work, the Law, and Social Action, in Social Casework, July 1964, pp. 383, 386.

[29] See Note, Rights and Rehabilitation in the Juvenile Courts, 67 Col. L. Rev. 281, 321, and *passim* (1967).

as that reported in an exceptionally reliable study of repeaters or recidivism conducted by the Stanford Research Institute for the President's Commission on Crime in the District of Columbia. This Commission's Report states:

"In fiscal 1966 approximately 66 percent of the 16- and 17-year-old juveniles referred to the court by the Youth Aid Division had been before the court previously. In 1965, 56 percent of those in the Receiving Home were repeaters. The SRI study revealed that 61 percent of the sample Juvenile Court referrals in 1965 had been previously referred at least once and that 42 percent had been referred at least twice before." *Id.*, at 773.

Certainly, these figures and the high crime rates among juveniles to which we have referred (*supra,* n. 26), could not lead us to conclude that the absence of constitutional protections reduces crime, or that the juvenile system, functioning free of constitutional inhibitions as it has largely done, is effective to reduce crime or rehabilitate offenders. We do not mean by this to denigrate the juvenile court process or to suggest that there are not aspects of the juvenile system relating to offenders which are valuable. But the features of the juvenile system which its proponents have asserted are of unique benefit will not be impaired by constitutional domestication. For example, the commendable principles relating to the processing and treatment of juveniles separately from adults are in no way involved or affected by the procedural issues under discussion.[30] Further, we are

---

[30] Here again, however, there is substantial question as to whether fact and pretension, with respect to the separate handling and treatment of children, coincide. See generally *infra.*

While we are concerned only with procedure before the juvenile court in this case, it should be noted that to the extent that the special procedures for juveniles are thought to be justified by the

told that one of the important benefits of the special juvenile court procedures is that they avoid classifying the juvenile as a "criminal." The juvenile offender is now classed as a "delinquent." There is, of course, no reason why this should not continue. It is disconcerting,

---

special consideration and treatment afforded them, there is reason to doubt that juveniles always receive the benefits of such a *quid pro quo*. As to the problem and importance of special care at the adjudicatory stage, cf. nn. 14 and 26, *supra*. As to treatment, see Nat'l Crime Comm'n Report, pp. 80, 87; D. C. Crime Comm'n Report, pp. 665–676, 686–687 (at p. 687 the Report refers to the District's "bankruptcy of dispositional resources"), 692–695, 700–718 (at p. 701 the Report observes that "The Department of Public Welfare currently lacks even the rudiments of essential diagnostic and clinical services"); Wheeler & Cottrell, Juvenile Delinquency— Its Prevention and Control (Russell Sage Foundation, 1965), pp. 32– 35; Harvard Law Review Note, p. 809; Paulsen, Juvenile Courts, Family Courts, and the Poor Man, 54 Calif. L. Rev. 694, 709–712 (1966); Polier, A View From the Bench (1964). Cf. also, In the Matter of the Youth House, Inc., Report of the July 1966 "A" Term of the Bronx County Grand Jury, Supreme Court of New York, County of Bronx, Trial Term, Part XII, March 21, 1967 (cf. New York Times, March 23, 1967, p. 1, col. 8). The high rate of juvenile recidivism casts some doubt upon the adequacy of treatment afforded juveniles. See D. C. Crime Comm'n Report, p. 773; Nat'l Crime Comm'n Report, pp. 55, 78.

In fact, some courts have recently indicated that appropriate treatment is essential to the validity of juvenile custody, and therefore that a juvenile may challenge the validity of his custody on the ground that he is not in fact receiving any special treatment. See *Creek* v. *Stone*, —— U. S. App. D. C. ——, 379 F. 2d 106 (1967); *Kautter* v. *Reid*, 183 F. Supp. 352 (D. C. D. C. 1960); *White* v. *Reid*, 125 F. Supp. 647 (D. C. D. C. 1954). See also *Elmore* v. *Stone*, 122 U. S. App. D. C. 416, 355 F. 2d 841 (1966) (separate statement of Bazelon, C. J.); *Clayton* v. *Stone*, 123 U. S. App. D. C. 181, 358 F. 2d 548 (1966) (separate statement of Bazelon, C. J.). Cf. Wheeler & Cottrell, *supra*, pp. 32, 35; *In re Rich*, 125 Vt. 373, 216 A. 2d 266 (1966). Cf. also *Rouse* v. *Cameron*, 125 U. S. App. D. C. 366, 373 F. 2d 451 (1966); *Millard* v. *Cameron*, 125 U. S. App. D. C. 383, 373 F. 2d 468 (1966).

however, that this term has come to involve only slightly less stigma than the term "criminal" applied to adults.[31] It is also emphasized that in practically all jurisdictions, statutes provide that an adjudication of the child as a delinquent shall not operate as a civil disability or disqualify him for civil service appointment.[32] There is no reason why the application of due process requirements should interfere with such provisions.

Beyond this, it is frequently said that juveniles are protected by the process from disclosure of their deviational behavior. As the Supreme Court of Arizona phrased it in the present case, the summary procedures of Juvenile Courts are sometimes defended by a statement that it is the law's policy "to hide youthful errors from the full gaze of the public and bury them in the graveyard of the forgotten past." This claim of secrecy, however, is more rhetoric than reality. Disclosure of court records is discretionary with the judge in most jurisdictions. Statutory restrictions almost invariably apply only to the court records, and even as to those the evidence is that many courts routinely furnish information to the FBI and the military, and on request to government agencies and even to private employers.[33] Of more importance are police records. In most States the police keep a complete file of juvenile "police contacts" and have complete discretion as to disclosure of

---

[31] "[T]he word 'delinquent' has today developed such invidious connotations that the terminology is in the process of being altered; the new descriptive phrase is 'persons in need of supervision,' usually shortened to 'pins.'" Harvard Law Review Note, p. 799, n. 140. The N. Y. Family Court Act § 712 distinguishes between "delinquents" and "persons in need of supervision."

[32] See, *e. g.*, the Arizona provision, ARS § 8-228.

[33] Harvard Law Review Note, pp. 784–785, 800. Cf. Nat'l Crime Comm'n Report, pp. 87–88; Ketcham, The Unfulfilled Promise of the Juvenile Court, 7 Crime & Delin. 97, 102–103 (1961).

juvenile records. Police departments receive requests for information from the FBI and other law-enforcement agencies, the Armed Forces, and social service agencies, and most of them generally comply.[34] Private employers word their application forms to produce information concerning juvenile arrests and court proceedings, and in some jurisdictions information concerning juvenile police contacts is furnished private employers as well as government agencies.[35]

In any event, there is no reason why, consistently with due process, a State cannot continue, if it deems it appropriate, to provide and to improve provision for the confidentiality of records of police contacts and court action relating to juveniles. It is interesting to note, however, that the Arizona Supreme Court used the confidentiality argument as a justification for the type of notice which is here attacked as inadequate for due process purposes. The parents were given merely general notice that their child was charged with "delinquency." No facts were specified. The Arizona court held, however, as we shall discuss, that in addition to this general "notice," the child and his parents must be advised "of the facts involved in the case" no later than the initial hearing by the judge. Obviously, this does not "bury" the word about the child's transgressions. It merely defers the time of disclosure to a point when it is of limited use to the child or his parents in preparing his defense or explanation.

Further, it is urged that the juvenile benefits from informal proceedings in the court. The early conception

---

[34] Harvard Law Review Note, pp. 785–787.

[35] *Id.*, at 785, 800. See also, with respect to the problem of confidentiality of records, Note, Rights and Rehabilitation in the Juvenile Courts, 67 Col. L. Rev. 281, 286–289 (1967). Even the privacy of the juvenile hearing itself is not always adequately protected. *Id.*, at 285–286.

26

of the Juvenile Court proceeding was one in which a fatherly judge touched the heart and conscience of the erring youth by talking over his problems, by paternal advice and admonition, and in which, in extreme situations, benevolent and wise institutions of the State provided guidance and help "to save him from a downward career." [36] Then, as now, goodwill and compassion were admirably prevalent. But recent studies have, with surprising unanimity, entered sharp dissent as to the validity of this gentle conception. They suggest that the appearance as well as the actuality of fairness, impartiality and orderliness—in short, the essentials of due process—may be a more impressive and more therapeutic attitude so far as the juvenile is concerned. For example, in a recent study, the sociologists Wheeler and Cottrell observe that when the procedural laxness of the *"parens patriae"* attitude is followed by stern disciplining, the contrast may have an adverse effect upon the child, who feels that he has been deceived or enticed. They conclude as follows: "Unless appropriate due process of law is followed, even the juvenile who has violated the law may not feel that he is being fairly treated and may therefore resist the rehabilitative efforts of court personnel." [37] Of course, it is not suggested that juvenile court judges should fail appropriately to take account, in their demeanor and conduct, of the emotional and psychological attitude of the juveniles with whom they

[36] Mack, The Juvenile Court, 23 Harv. L. Rev. 104, 120 (1909).

[37] Juvenile Delinquency—Its Prevention and Control (Russell Sage Foundation, 1966), p. 33. The conclusion of the Nat'l Crime Comm'n Report is similar: "[T]here is increasing evidence that the informal procedures, contrary to the original expectation, may themselves constitute a further obstacle to effective treatment of the delinquent to the extent that they engender in the child a sense of injustice provoked by seemingly all-powerful and challengeless exercise of authority by judges and probation officers." *Id.*, at 85. See also Allen, The Borderland of Criminal Justice (1964), p. 19.

are confronted. While due process requirements will, in some instances, introduce a degree of order and regularity to Juvenile Court proceedings to determine delinquency, and in contested cases will introduce some elements of the adversary system, nothing will require that the conception of the kindly juvenile judge be replaced by its opposite, nor do we here rule upon the question whether ordinary due process requirements must be observed with respect to hearings to determine the disposition of the delinquent child.

Ultimately, however, we confront the reality of that portion of the Juvenile Court process with which we deal in this case. A boy is charged with misconduct. The boy is committed to an institution where he may be restrained of liberty for years. It is of no constitutional consequence—and of limited practical meaning—that the institution to which he is committed is called an Industrial School. The fact of the matter is that, however euphemistic the title, a "receiving home" or an "industrial school" for juveniles is an institution of confinement in which the child is incarcerated for a greater or lesser time. His world becomes "a building with whitewashed walls, regimented routine and institutional hours . . . ." [38] Instead of mother and father and sisters and brothers and friends and classmates, his world is peopled by guards, custodians, state employees, and "delinquents" confined with him for anything from waywardness [39] to rape and homicide.

In view of this, it would be extraordinary if our Constitution did not require the procedural regularity and

---

[38] *Holmes' Appeal*, 379 Pa. 599, 616, 109 A. 2d 523, 530 (1954) (Musmanno, J., dissenting). See also *The State (Sheerin)* v. *Governor*, [1966] I. R. 379 (Supreme Court of Ireland); *Trimble* v. *Stone*, 187 F. Supp. 483, 485–486 (D. C. D. C. 1960); Allen, The Borderland of Criminal Justice (1964), pp. 18, 52–56.

[39] Cf. the Juvenile Code of Arizona, ARS § 8–201–6.

the exercise of care implied in the phrase "due process." Under our Constitution, the condition of being a boy does not justify a kangaroo court. The traditional ideas of Juvenile Court procedure, indeed, contemplated that time would be available and care would be used to establish precisely what the juvenile did and why he did it—was it a prank of adolescence or a brutal act threatening serious consequences to himself or society unless corrected? [40] Under traditional notions, one would assume that in a case like that of Gerald Gault, where the juvenile appears to have a home, a working mother and father, and an older brother, the Juvenile Judge would have made a careful inquiry and judgment as to the possibility that the boy could be disciplined and dealt with at home, despite his previous transgressions.[41] Indeed, so far as appears in the record before us, except for some conversation with Gerald about his school work and his "wanting to go to . . . Grand Canyon with his father," the points to which the judge directed his attention were little different from those that would be in-

---

[40] Cf., however, the conclusions of the D. C. Crime Comm'n Report, pp. 692–693, concerning the inadequacy of the "social study records" upon which the Juvenile Court Judge must make this determination and decide on appropriate treatment.

[41] The Juvenile Judge's testimony at the habeas corpus proceeding is devoid of any meaningful discussion of this. He appears to have centered his attention upon whether Gerald made the phone call and used lewd words. He was impressed by the fact that Gerald was on six months' probation because he was with another boy who allegedly stole a purse—a different sort of offense, sharing the feature that Gerald was "along." And he even referred to a report which he said was not investigated because "there was no accusation" "because of lack of material foundation."

With respect to the possible duty of a trial court to explore alternatives to involuntary commitment in a civil proceeding, cf. *Lake* v. *Cameron*, 124 U. S. App. D. C. 264, 364 F. 2d 657 (1966), which arose under statutes relating to treatment of the mentally ill.

volved in determining any charge of violation of a penal statute.[42] The essential difference between Gerald's case and a normal criminal case is that safeguards available to adults were discarded in Gerald's case. The summary procedure as well as the long commitment was possible because Gerald was 15 years of age instead of over 18.

If Gerald had been over 18, he would not have been subject to Juvenile Court proceedings.[43] For the particular offense immediately involved, the maximum punishment would have been a fine of $5 to $50, or imprisonment in jail for not more than two months. Instead, he was committed to custody for a maximum of six years. If he had been over 18 and had committed an offense to which such a sentence might apply, he would have been entitled to substantial rights under the Constitution of the United States as well as under Arizona's laws and constitution. The United States Constitution would guarantee him rights and protections with respect to arrest, search and seizure, and pretrial interrogation. It would assure him of specific notice of the charges and adequate time to decide his course of action and to prepare his defense. He would be entitled to clear advice that he could be represented by counsel, and, at least if a felony were involved, the State would be required to provide counsel if his parents were unable to afford it. If the court acted on the basis of his confession, careful procedures would be required to assure its voluntariness. If the case went to trial, confrontation and opportunity for cross-examination would be guaranteed. So wide a gulf between the State's treatment of the adult and of the child requires a bridge sturdier than mere

---

[42] While appellee's brief suggests that the probation officer made some investigation of Gerald's home life, etc., there is not even a claim that the judge went beyond the point stated in the text.

[43] ARS §§ 8–201, 8–202.

verbiage, and reasons more persuasive than cliché can provide. As Wheeler and Cottrell have put it, "The rhetoric of the juvenile court movement has developed without any necessarily close correspondence to the realities of court and institutional routines." [44]

In *Kent* v. *United States, supra,* we stated that the Juvenile Court Judge's exercise of the power of the state as *parens patriae* was not unlimited. We said that "the admonition to function in a 'parental' relationship is not an invitation to procedural arbitrariness." [45] With respect to the waiver by the Juvenile Court to the adult court of jurisdiction over an offense committed by a youth, we said that "there is no place in our system of law for reaching a result of such tremendous consequences without ceremony—without hearing, without effective assistance of counsel, without a statement of reasons." [46] We announced with respect to such waiver proceedings that while "We do not mean . . . to indicate that the hearing to be held must conform with all of the requirements of a criminal trial or even of the usual administrative hearing; but we do hold that the hearing must measure up to the essentials of due process and fair treatment." [47] We reiterate this view, here in connection with a juvenile court adjudication of "delinquency," as a requirement

---

[44] Juvenile Delinquency—Its Prevention and Control (Russell Sage Foundation, 1966), p. 35. The gap between rhetoric and reality is also emphasized in the Nat'l Crime Comm'n Report, pp. 80–81.

[45] 383 U. S., at 555.

[46] 383 U. S., at 554. THE CHIEF JUSTICE stated in a recent speech to a conference of the National Council of Juvenile Court Judges, that a juvenile court "must function within the framework of law and . . . in the attainment of its objectives it cannot act with unbridled caprice." Equal Justice for Juveniles, 15 Juvenile Court Judges Journal, No. 3, pp. 14, 15 (1964).

[47] 383 U. S., at 562.

which is part of the Due Process Clause of the Fourteenth Amendment of our Constitution.[48]

We now turn to the specific issues which are presented to us in the present case.

### III.

#### NOTICE OF CHARGES.

Appellants allege that the Arizona Juvenile Code is unconstitutional or alternatively that the proceedings before the Juvenile Court were constitutionally defective because of failure to provide adequate notice of the hearings. No notice was given to Gerald's parents when he was taken into custody on Monday, June 8. On that night, when Mrs. Gault went to the Detention Home, she was orally informed that there would be a hearing the next afternoon and was told the reason why Gerald was in custody. The only written notice Gerald's parents received at any time was a note on plain paper from Officer Flagg delivered on Thursday or Friday, June 11 or 12, to the effect that the judge had set Monday, June 15, "for further Hearings on Gerald's delinquency."

A "petition" was filed with the court on June 9 by Officer Flagg, reciting only that he was informed and believed that "said minor is a delinquent minor and that it is necessary that some order be made by the Honorable Court for said minor's welfare." The applicable Arizona

---

[48] The Nat'l Crime Comm'n Report recommends that "Juvenile courts should make fullest feasible use of preliminary conferences to dispose of cases short of adjudication." *Id.*, at 84. See also D. C. Crime Comm'n Report, pp. 662–665. Since this "consent decree" procedure would involve neither adjudication of delinquency nor institutionalization, nothing we say in this opinion should be construed as expressing any views with respect to such procedure. The problems of pre-adjudication treatment of juveniles, and of post-adjudication disposition, are unique to the juvenile process; hence what we hold in this opinion with regard to the procedural requirements at the adjudicatory stage has no necessary applicability to other steps of the juvenile process.

statute provides for a petition to be filed in Juvenile Court, alleging in general terms that the child is "neglected, dependent or delinquent." The statute explicitly states that such a general allegation is sufficient, "without alleging the facts." [49] There is no requirement that the petition be served and it was not served upon, given to, or shown to Gerald or his parents. [50]

The Supreme Court of Arizona rejected appellants' claim that due process was denied because of inadequate notice. It stated that "Mrs. Gault knew the exact nature of the charge against Gerald from the day he was taken to the detention home." The court also pointed out that the Gaults appeared at the two hearings "without objection." The court held that because "the policy of the juvenile law is to hide youthful errors from the full gaze of the public and bury them in the graveyard of the forgotten past," advance notice of the specific charges or basis for taking the juvenile into custody and for the hearing is not necessary. It held that the appropriate rule is that "the infant and his parent or guardian will receive a petition only reciting a conclusion of delinquency. [51] But no later than the initial hearing by the judge, they must be advised of the facts involved in the

[49] ARS § 8-222 (B).

[50] Arizona's Juvenile Code does not provide for notice of any sort to be given at the commencement of the proceedings to the child or his parents. Its only notice provision is to the effect that if a person other than the parent or guardian is cited to appear, the parent or guardian shall be notified "by personal service" of the time and place of hearing. ARS § 8-224. The procedure for initiating a proceeding, as specified by the statute, seems to require that after a preliminary inquiry by the court, a determination may be made "that formal jurisdiction should be acquired." Thereupon the court may authorize a petition to be filed. ARS § 8-222. It does not appear that this procedure was followed in the present case.

[51] No such petition was served or supplied in the present case.

case. If the charges are denied, they must be given a reasonable period of time to prepare."

We cannot agree with the court's conclusion that adequate notice was given in this case. Notice, to comply with due process requirements, must be given sufficiently in advance of scheduled court proceedings so that reasonable opportunity to prepare will be afforded, and it must "set forth the alleged misconduct with particularity." [52] It is obvious, as we have discussed above, that no purpose of shielding the child from the public stigma of knowledge of his having been taken into custody and scheduled for hearing is served by the procedure approved by the court below. The "initial hearing" in the present case was a hearing on the merits. Notice at that time is not timely; and even if there were a conceivable purpose served by the deferral proposed by the court below, it would have to yield to the requirements that the child and his parents or guardian be notified, in writing, of the specific charge or factual allegations to be considered at the hearing, and that such written notice be given at the earliest practicable time, and in any event sufficiently in advance of the hearing to permit preparation. Due process of law requires notice of the sort we have described— that is, notice which would be deemed constitutionally adequate in a civil or criminal proceeding.[53] It does

---

[52] Nat'l Crime Comm'n Report, p. 87. The Commission observed that "The unfairness of too much informality is . . . reflected in the inadequacy of notice to parents and juveniles about charges and hearings." *Ibid.*

[53] For application of the due process requirement of adequate notice in a criminal context, see, *e. g., Cole* v. *Arkansas,* 333 U. S. 196 (1948); *In re Oliver,* 333 U. S. 257, 273–278 (1948). For application in a civil context, see, *e. g., Armstrong* v. *Manzo,* 380 U. S. 545 (1965); *Mullane* v. *Central Hanover Tr. Co.,* 339 U. S. 306 (1950). Cf. also *Chaloner* v. *Sherman,* 242 U. S. 455 (1917). The Court's discussion in these cases of the right to timely and adequate notice forecloses any contention that the notice approved by the

not allow a hearing to be held in which a youth's freedom and his parents' right to his custody are at stake without giving them timely notice, in advance of the hearing, of the specific issues that they must meet. Nor, in the circumstances of this case, can it reasonably be said that the requirement of notice was waived.[54]

## IV.

### RIGHT TO COUNSEL.

Appellants charge that the Juvenile Court proceedings were fatally defective because the court did not advise Gerald or his parents of their right to counsel, and proceeded with the hearing, the adjudication of delinquency and the order of commitment in the absence of counsel for the child and his parents or an express waiver of the right thereto. The Supreme Court of Arizona pointed out that "[t]here is disagreement [among the various jurisdictions] as to whether the court must advise the infant

Arizona Supreme Court, or the notice actually given the Gaults, was constitutionally adequate. See also Antieau, Constitutional Rights in Juvenile Courts, 46 Cornell L. Q. 387, 395 (1961); Paulsen, Fairness to the Juvenile Offender, 41 Minn. L. Rev. 547, 557 (1957). Cf. Standards, pp. 63–65; Procedures and Evidence in the Juvenile Court, A Guidebook for Judges, prepared by the Advisory Council of Judges of the National Council on Crime and Delinquency (1962), pp. 9–23 (and see cases discussed therein).

[54] Mrs. Gault's "knowledge" of the charge against Gerald, and/or the asserted failure to object, does not excuse the lack of adequate notice. Indeed, one of the·purposes of notice is to clarify the issues to be considered, and as our discussion of the facts, *supra*, shows, even the Juvenile Court Judge was uncertain as to the precise issues determined at the two "hearings." Since the Gaults had no counsel and were not told of their right to counsel, we cannot consider their failure to object to the lack of constitutionally adequate notice as a waiver of their rights. Because of our conclusion that notice given only at the first hearing is inadequate, we need not reach the question whether the Gaults ever received adequately specific notice even at the June 9 hearing, in light of the fact they were never apprised of the charge of being habitually involved in immoral matters.

that he has a right to counsel." [55]   It noted its own decision in *Arizona State Dept. of Public Welfare* v. *Barlow*, 80 Ariz. 249, 296 P. 2d 298 (1956), to the effect "that *the parents* of an infant in a juvenile proceeding cannot be denied representation by counsel of their choosing." (Emphasis added.)   It referred to a provision of the Juvenile Code which it characterized as requiring "that the probation officer shall look after the interests of neglected, delinquent and dependent children," including representing their interests in court.[56]   The court argued that "The parent and the probation officer may be relied upon to protect the infant's interests."   Accordingly it rejected the proposition that "due process requires that an infant have a right to counsel."   It said that juvenile courts have the discretion, but not the duty, to allow such representation; it referred specifically to the situation in which the Juvenile Court discerns conflict between the child and his parents as an instance in which this discretion might be exercised.   We do not agree.   Proba-

---

[55] For recent cases in the District of Columbia holding that there must be advice of the right to counsel, and to have counsel appointed if necessary, see, *e. g.*, *Shioutakon* v. *District of Columbia*, 98 U. S. App. D. C. 371, 236 F. 2d 666 (1956); *Black* v. *United States*, 122 U. S. App. D. C. 393, 355 F. 2d 104 (1965); *In re Poff*, 135 F. Supp. 224 (D. C. D. C. 1955).   Cf. also *In re Long*, 184 So. 2d 861, 862 (1966); *People* v. *Dotson*, 46 Cal. 2d 891, 299 P. 2d 875 (1956).

[56] The section cited by the court, ARS § 8–204–C, reads as follows:

"The probation officer shall have the authority of a peace officer. He shall:

"1. Look after the interests of neglected, delinquent and dependent children of the county.

"2. Make investigations and file petitions.

"3. Be present in court when cases are heard concerning children and represent their interests.

"4. Furnish the court information and assistance as it may require.

"5. Assist in the collection of sums ordered paid for the support of children.

"6. Perform other acts ordered by the court."

tion officers, in the Arizona scheme, are also arresting officers. They initiate proceedings and file petitions which they verify, as here, alleging the delinquency of the child; and they testify, as here, against the child. And here the probation officer was also superintendent of the Detention Home. The probation officer cannot act as counsel for the child. His role in the adjudicatory hearing, by statute and in fact, is as arresting officer and witness against the child. Nor can the judge represent the child. There is no material difference in this respect between adult and juvenile proceedings of the sort here involved. In adult proceedings, this contention has been foreclosed by decisions of this Court.[57] A proceeding where the issue is whether the child will be found to be "delinquent" and subjected to the loss of his liberty for years is comparable in seriousness to a felony prosecution. The juvenile needs the assistance of counsel to cope with problems of law,[58] to make skilled inquiry into the facts, to insist upon regularity of the proceedings, and to ascertain whether he has a defense and to prepare and submit it. The child "requires the guiding hand of counsel at every step in the proceedings against him."[59] Just as in *Kent* v. *United States, supra,* at 561–562, we indicated our agreement with the United States Court of Appeals for the District of Columbia Circuit that the assistance of counsel is essential for purposes of waiver proceedings, so we hold now that it is equally essential for the determination of delinquency, carrying with it the awesome prospect of incarceration

[57] *Powell* v. *Alabama,* 287 U. S. 45, 61 (1932); *Gideon* v. *Wainwright,* 372 U. S. 335 (1963).

[58] In the present proceeding, for example, although the Juvenile Judge believed that Gerald's telephone conversation was within the condemnation of ARS § 13–377, he suggested some uncertainty because the statute prohibits the use of vulgar language "in the presence or hearing of" a woman or child.

[59] *Powell* v. *Alabama,* 287 U. S. 45, 69 (1932).

in a state institution until the juvenile reaches the age of 21.[60]

During the last decade, court decisions,[61] experts,[62] and legislatures [63] have demonstrated increasing recognition of this view. In at least one-third of the States, statutes

[60] This means that the commitment, in virtually all cases, is for a minimum of three years since jurisdiction of juvenile courts is usually limited to age 18 and under.

[61] See cases cited in n. 55, *supra*.

[62] See, *e. g.*, Schinitsky, 17 The Record 10 (N. Y. City Bar Assn. 1962); Paulsen, Fairness to the Juvenile Offender, 41 Minn. L. Rev. 547, 568–573 (1957); Antieau, Constitutional Rights in Juvenile Courts, 46 Cornell L. Q. 387, 404–407 (1961); Paulsen, Kent v. United States: The Constitutional Context of Juvenile Cases, 1966 Sup. Ct. Rev. 167, 187–189; Ketcham, The Legal Renaissance in the Juvenile Court, 60 Nw. U. L. Rev. 585 (1965); Elson, Juvenile Courts & Due Process, in Justice for the Child (Rosenheim ed.) 95, 103–105 (1962); Note, Rights and Rehabilitation in the Juvenile Courts, 67 Col. L. Rev. 281, 321–327 (1967). See also Nat'l Probation and Parole Assn., Standard Family Court Act (1959) § 19, and Standard Juvenile Court Act (1959) § 19, in 5 NPPA Journal 99, 137, 323, 367 (1959) (hereinafter cited as Standard Family Court Act and Standard Juvenile Court Act, respectively).

[63] Only a few state statutes require advice of the right to counsel and to have counsel appointed. See N. Y. Family Court Act §§ 241, 249, 728, 741; Calif. Welf. & Inst'ns Code §§ 633, 634, 659, 700 (1966) (appointment is mandatory only if conduct would be a felony in the case of an adult); Minn. Stat. Ann. § 260.155 (2) (1966 Supp.) (see Comment of Legislative Commission accompanying this section); District of Columbia Legal Aid Act, D. C. Code Ann. § 2–2202 (1961) (Legal Aid Agency "shall make attorneys available to represent indigents . . . in proceedings before the juvenile court . . . ." See *Black* v. *United States*, 122 U. S. App. D. C. 393, 395–396, 355 F. 2d 104, 106–107 (1965), construing this Act as providing a right to appointed counsel and to be informed of that right). Other state statutes allow appointment on request, or in some classes of cases, or in the discretion of the court, etc. The state statutes are collected and classified in Riederer, The Role of Counsel in the Juvenile Court, 2 J. Fam. Law 16, 19–20 (1962), which, however, does not treat the statutes cited above. See also Note, Rights and Rehabilitation in the Juvenile Courts, 67 Col. L. Rev. 281, 321–322 (1967).

now provide for the right of representation by retained counsel in juvenile delinquency proceedings, notice of the right, or assignment of counsel, or a combination of these. In other States, court rules have similar provisions.[64]

The President's Crime Commission has recently recommended that in order to assure "procedural justice for the child," it is necessary that "Counsel . . . be appointed as a matter of course wherever coercive action is a possibility, without requiring any affirmative choice by child or parent." [65] As stated by the authoritative "Standards

---

[64] Skoler & Tenney, Attorney Representation in Juvenile Court, 4 J. Fam. Law 77, 95–96 (1964); Riederer, The Role of Counsel in the Juvenile Court, 2 J. Fam. Law 16 (1962).

Recognition of the right to counsel involves no necessary interference with the special purposes of juvenile court procedures; indeed, it seems that counsel can play an important role in the process of rehabilitation. See Note, Rights and Rehabilitation in the Juvenile Courts, 67 Col. L. Rev. 281, 324–327 (1967).

[65] Nat'l Crime Comm'n Report, pp. 86–87. The Commission's statement of its position is very forceful:

"The Commission believes that no single action holds more potential for achieving procedural justice for the child in the juvenile court than provision of counsel. The presence of an independent legal representative of the child, or of his parent, is the keystone of the whole structure of guarantees that a minimum system of procedural justice requires. The rights to confront one's accusers, to cross-examine witnesses, to present evidence and testimony of one's own, to be unaffected by prejudicial and unreliable evidence, to participate meaningfully in the dispositional decision, to take an appeal have substantial meaning for the overwhelming majority of persons brought before the juvenile court only if they are provided with competent lawyers who can invoke those rights effectively. The most informal and well-intentioned of judicial proceedings are technical; few adults without legal training can influence or even understand them; certainly children cannot. Papers are drawn and charges expressed in legal language. Events follow one another in a manner that appears arbitrary and confusing to the uninitiated. Decisions, unexplained, appear too official to challenge. But with lawyers come records of proceedings; records make possible appeals

for Juvenile and Family Courts," published by the Children's Bureau of the United States Department of Health, Education, and Welfare:

> "As a component part of a fair hearing required by due process guaranteed under the 14th amendment, notice of the right to counsel should be required at all hearings and counsel provided upon request when the family is financially unable to employ counsel." Standards, p. 57.

which, even if they do not occur, impart by their possibility a healthy atmosphere of accountability.

"Fears have been expressed that lawyers would make juvenile court proceedings adversary. No doubt this is partly true, but it is partly desirable. Informality is often abused. The juvenile courts deal with cases in which facts are disputed and in which, therefore, rules of evidence, confrontation of witnesses, and other adversary procedures are called for. They deal with many cases involving conduct that can lead to incarceration or close supervision for long periods, and therefore juveniles often need the same safeguards that are granted to adults. And in all cases children need advocates to speak for them and guard their interests, particularly when disposition decisions are made. It is the disposition stage at which the opportunity arises to offer individualized treatment plans and in which the danger inheres that the court's coercive power will be applied without adequate knowledge of the circumstances.

"Fears also have been expressed that the formality lawyers would bring into juvenile court would defeat the therapeutic aims of the court. But informality has no necessary connection with therapy; it is a device that has been used to approach therapy, and it is not the only possible device. It is quite possible that in many instances lawyers, for all their commitment to formality, could do more to further therapy for their clients than can the small, overworked social staffs of the courts. . . .

"The Commission believes it is essential that counsel be appointed by the juvenile court for those who are unable to provide their own. Experience under the prevailing systems in which children are free to seek counsel of their choice reveals how empty of meaning the right is for those typically the subjects of juvenile court proceedings. Moreover, providing counsel only when the child is sophisticated

This statement was "reviewed" by the National Council of Juvenile Court Judges at its 1965 Convention and they "found no fault" with it.[66] The New York Family Court Act contains the following statement:

"This act declares that minors have a right to the assistance of counsel of their own choosing or of law guardians[67] in neglect proceedings under article three and in proceedings to determine juvenile delinquency and whether a person is in need of supervision under article seven. This declaration is based on a finding that counsel is often indispensable to a practical realization of due process of law and may be helpful in making reasoned determinations of fact and proper orders of disposition." [68]

The Act provides that "At the commencement of any hearing" under the delinquency article of the statute, the juvenile and his parent shall be advised of the juvenile's

---

enough to be aware of his need and to ask for one or when he fails to waive his announced right [is] not enough, as experience in numerous jurisdictions reveals.

*"The Commission recommends:*

"COUNSEL SHOULD BE APPOINTED AS A MATTER OF COURSE WHEREVER COERCIVE ACTION IS A POSSIBILITY, WITHOUT REQUIRING ANY AFFIRMATIVE CHOICE BY CHILD OR PARENT."

[66] Lehman, A Juvenile's Right to Counsel in A Delinquency Hearing, 17 Juvenile Court Judge's Journal 53 (1966). In an interesting review of the 1966 edition of the Children's Bureau's "Standards," Rosenheim, Standards for Juvenile and Family Courts: Old Wine in a New Bottle, 1 Fam. L. Q. 25, 29 (1967), the author observes that "The 'Standards' of 1966, just like the 'Standards' of 1954, are valuable precisely because they represent a diligent and thoughtful search for an accommodation between the aspirations of the founders of the juvenile court and the grim realities of life against which, in part, the due process of criminal and civil law offers us protection."

[67] These are lawyers designated, as provided by the statute, to represent minors. N. Y. Family Court Act § 242.

[68] N. Y. Family Court Act § 241.

"right to be represented by counsel chosen by him or his parent . . . or by a law guardian assigned by the court . . . ."[69] The California Act (1961) also requires appointment of counsel.[70]

We conclude that the Due Process Clause of the Fourteenth Amendment requires that in respect of proceedings to determine delinquency which may result in commitment to an institution in which the juvenile's freedom is curtailed, the child and his parents must be notified of the child's right to be represented by counsel retained by them, or if they are unable to afford counsel, that counsel will be appointed to represent the child.

At the habeas corpus proceeding, Mrs. Gault testified that she knew that she could have appeared with counsel

---

[69] N. Y. Family Court Act § 741. For accounts of New York practice under the new procedures, see Isaacs, The Role of the Lawyer in Representing Minors in the New Family Court, 12 Buffalo L. Rev. 501 (1963); Dembitz, Ferment and Experiment in New York: Juvenile Cases in the New Family Court, 48 Cornell L. Q. 499, 508–512 (1963). Since introduction of the law guardian system in September of 1962, it is stated that attorneys are present in the great majority of cases. Harvard Law Review Note, p. 796. See New York Judicial Conference, Twelfth Annual Report, pp. 288–291 (1967), for detailed statistics on representation of juveniles in New York. For the situation before 1962, see Schinitsky, The Role of the Lawyer in Children's Court, 17 The Record 10 (N. Y. City Bar Assn. 1962). In the District of Columbia, where statute and court decisions require that a lawyer be appointed if the family is unable to retain counsel, see n. 63, *supra,* and where the juvenile and his parents are so informed at the initial hearing, about 85% to 90% do not choose to be represented and sign a written waiver form. D. C. Crime Comm'n Report, p. 646. The Commission recommends adoption in the District of Columbia of a "law guardian" system similar to that of New York, with more effective notification of the right to appointed counsel, in order to eliminate the problems of procedural fairness, accuracy of fact-finding, and appropriateness of disposition which the absence of counsel in so many juvenile court proceedings involves. *Id.,* at 681–685.

[70] See n. 63, *supra.*

at the juvenile hearing. This knowledge is not a waiver of the right to counsel which she and her juvenile son had, as we have defined it. They had a right expressly to be advised that they might retain counsel and to be confronted with the need for specific consideration of whether they did or did not choose to waive the right. If they were unable to afford to employ counsel, they were entitled in view of the seriousness of the charge and the potential commitment, to appointed counsel, unless they chose waiver. Mrs. Gault's knowledge that she could employ counsel was not an "intentional relinquishment or abandonment" of a fully known right.[71]

## V.

### CONFRONTATION, SELF-INCRIMINATION, CROSS-EXAMINATION.

Appellants urge that the writ of habeas corpus should have been granted because of the denial of the rights of confrontation and cross-examination in the Juvenile Court hearings, and because the privilege against self-incrimination was not observed. The Juvenile Court Judge testified at the habeas corpus hearing that he had proceeded on the basis of Gerald's admissions at the two hearings. Appellants attack this on the ground that the admissions were obtained in disregard of the privilege against self-incrimination.[72] If the confession is disregarded, appellants argue that the delinquency conclusion, since it was fundamentally based on a finding that Gerald had made lewd remarks during the phone call to Mrs. Cook, is fatally defective for failure to accord the rights of confrontation and cross-examination which the Due Process Clause of the Fourteenth Amendment of the

---

[71] *Johnson* v. *Zerbst*, 304 U. S. 458, 464 (1938); *Carnley* v. *Cochran*, 369 U. S. 506 (1962); *United States ex rel. Brown* v. *Fay*, 242 F. Supp. 273 (D. C. S. D. N. Y. 1965).

[72] The privilege is applicable to state proceedings. *Malloy* v. *Hogan*, 378 U. S. 1 (1964).

Federal Constitution guarantees in state proceedings generally.[73]

Our first question, then, is whether Gerald's admission was improperly obtained and relied on as the basis of decision, in conflict with the Federal Constitution. For this purpose, it is necessary briefly to recall the relevant facts.

Mrs. Cook, the complainant, and the recipient of the alleged telephone call, was not called as a witness. Gerald's mother asked the Juvenile Court Judge why Mrs. Cook was not present and the judge replied that "she didn't have to be present." So far as appears, Mrs. Cook was spoken to only once, by Officer Flagg, and this was by telephone. The judge did not speak with her on any occasion. Gerald had been questioned by the probation officer after having been taken into custody. The exact circumstances of this questioning do not appear but any admissions Gerald may have made at this time do not appear in the record.[74] Gerald was also questioned by the Juvenile Court Judge at each of the two hearings. The judge testified in the habeas corpus proceeding that Gerald admitted making "some of the lewd statements . . . [but not] any of the more serious lewd statements." There was conflict and uncertainty among the witnesses at the habeas corpus proceeding—the Juvenile Court Judge, Mr. and Mrs. Gault, and the probation officer—as to what Gerald did or did not admit.

We shall assume that Gerald made admissions of the sort described by the Juvenile Court Judge, as quoted above. Neither Gerald nor his parents were advised that

---

[73] *Pointer* v. *Texas,* 380 U. S. 400 (1965); *Douglas* v. *Alabama,* 380 U. S. 415 (1965).

[74] For this reason, we cannot consider the status of Gerald's alleged admissions to the probation officers. Cf., however, Comment, *Miranda* Guarantees in the California Juvenile Court, 7 Santa Clara Lawyer 114 (1966).

he did not have to testify or make a statement, or that an incriminating statement might result in his commitment as a "delinquent."

The Arizona Supreme Court rejected appellants' contention that Gerald had a right to be advised that he need not incriminate himself. It said: "We think the necessary flexibility for individualized treatment will be enhanced by a rule which does not require the judge to advise the infant of a privilege against self-incrimination."

In reviewing this conclusion of Arizona's Supreme Court, we emphasize again that we are here concerned only with a proceeding to determine whether a minor is a "delinquent" and which may result in commitment to a state institution. Specifically, the question is whether, in such a proceeding, an admission by the juvenile may be used against him in the absence of clear and unequivocal evidence that the admission was made with knowledge that he was not obliged to speak and would not be penalized for remaining silent. In light of *Miranda* v. *Arizona*, 384 U. S. 436 (1966), we must also consider whether, if the privilege against self-incrimination is available, it can effectively be waived unless counsel is present or the right to counsel has been waived.

It has long been recognized that the eliciting and use of confessions or admissions require careful scrutiny. Dean Wigmore states:

"The ground of distrust of confessions made in certain situations is, in a rough and indefinite way, judicial experience. There has been no careful collection of statistics of untrue confessions, nor has any great number of instances been even loosely reported . . . but enough have been verified to fortify the conclusion, based on ordinary observation of human conduct, that under certain stresses a person, especially one of defective mentality or peculiar

temperament, may falsely acknowledge guilt. This possibility arises wherever the innocent person is placed in such a situation that the untrue acknowledgment of guilt is at the time the more promising of two alternatives between which he is obliged to choose; that is, he chooses any risk that may be in falsely acknowledging guilt, in preference to some worse alternative associated with silence.

.   .   .   .   .

"The principle, then, upon which a confession may be excluded is that it is, under certain conditions, *testimonially untrustworthy* . . . . [T]he essential feature is that the principle of exclusion is a testimonial one, analogous to the other principles which exclude narrations as untrustworthy . . . ." [75]

This Court has emphasized that admissions and confessions of juveniles require special caution. In *Haley* v. *Ohio,* 332 U. S. 596, where this Court reversed the conviction of a 15-year-old boy for murder, MR. JUSTICE DOUGLAS said:

"What transpired would make us pause for careful inquiry if a mature man were involved. And when, as here, a mere child—an easy victim of the law—is before us, special care in scrutinizing the record must be used. Age 15 is a tender and difficult age for a boy of any race. He cannot be judged by the more exacting standards of maturity. That which would leave a man cold and unimpressed can overawe and overwhelm a lad in his early teens. This is the period of great instability which the crisis of adolescence produces. A 15-year-old lad, questioned through the dead of night by relays of police, is a ready victim of the inquisition. Mature men possibly might stand the ordeal from midnight

---

[75] 3 Wigmore, Evidence § 822 (3d ed. 1940).

to 5 a. m. But we cannot believe that a lad of tender years is a match for the police in such a contest. He needs counsel and support if he is not to become the victim first of fear, then of panic. He needs someone on whom to lean lest the overpowering presence of the law, as he knows it, crush him. No friend stood at the side of this 15-year-old boy as the police, working in relays, questioned him hour after hour, from midnight until dawn. No lawyer stood guard to make sure that the police went so far and no farther, to see to it that they stopped short of the point where he became the victim of coercion. No counsel or friend was called during the critical hours of questioning." [76]

In *Haley*, as we have discussed, the boy was convicted in an adult court, and not a juvenile court. In notable decisions, the New York Court of Appeals and the Supreme Court of New Jersey have recently considered decisions of Juvenile Courts in which boys have been adjudged "delinquent" on the basis of confessions obtained in circumstances comparable to those in *Haley*. In both instances, the State contended before its highest tribunal that constitutional requirements governing inculpatory statements applicable in adult courts do not apply to juvenile proceedings. In each case, the State's contention was rejected, and the juvenile court's determination of delinquency was set aside on the grounds of inadmissibility of the confession. *In the Matters of Gregory W. and Gerald S.*, 19 N. Y. 2d 55, 224 N. E. 2d 102 (1966) (opinion by Keating, J.), and *In the Interests of Carlo and Stasilowicz*, 48 N. J. 224, 225 A. 2d 110 (1966) (opinion by Proctor, J.).

---

[76] 332 U. S., at 599–600 (opinion of MR. JUSTICE DOUGLAS, joined by JUSTICES BLACK, Murphy and Rutledge; Justice Frankfurter concurred in a separate opinion).

The privilege against self-incrimination is, of course, related to the question of the safeguards necessary to assure that admissions or confessions are reasonably trustworthy, that they are not the mere fruits of fear or coercion, but are reliable expressions of the truth. The roots of the privilege are, however, far deeper. They tap the basic stream of religious and political principle because the privilege reflects the limits of the individual's attornment to the state and—in a philosophical sense—insists upon the equality of the individual and the state.[77] In other words, the privilege has a broader and deeper thrust than the rule which prevents the use of confessions which are the product of coercion because coercion is thought to carry with it the danger of unreliability. One of its purposes is to prevent the state, whether by force or by psychological domination, from overcoming the mind and will of the person under investigation and depriving him of the freedom to decide whether to assist the state in securing his conviction.[78]

It would indeed be surprising if the privilege against self-incrimination were available to hardened criminals but not to children. The language of the Fifth Amendment, applicable to the States by operation of the Fourteenth Amendment, is unequivocal and without exception. And the scope of the privilege is comprehensive. As MR. JUSTICE WHITE, concurring, stated in *Murphy* v. *Waterfront Commission,* 378 U. S. 52, 94 (1964):

> "The privilege can be claimed in *any proceeding,* be it criminal or civil, administrative or judicial, investigatory or adjudicatory . . . it protects *any dis-*

---

[77] See Fortas, The Fifth Amendment, 25 Cleveland Bar Assn. Journal 91 (1954).

[78] See *Rogers* v. *Richmond,* 365 U. S. 534 (1961); *Culombe* v. *Connecticut,* 367 U. S. 568 (1961) (opinion of Mr. Justice Frankfurter, joined by MR. JUSTICE STEWART); *Miranda* v. *Arizona,* 384 U. S. 436 (1966).

48

*closures* which the witness may reasonably apprehend *could be used in a criminal prosecution or which could lead to other evidence that might be so used."* [79]  (Emphasis added.)

With respect to juveniles, both common observation and expert opinion emphasize that the "distrust of confessions made in certain situations" to which Dean Wigmore referred in the passage quoted *supra,* at 44–45, is imperative in the case of children from an early age through adolescence. In New York, for example, the recently enacted Family Court Act provides that the juvenile and his parents must be advised at the start of the hearing of his right to remain silent.[80]  The New York statute also provides that the police must attempt to communicate with the juvenile's parents before questioning him,[81] and that absent "special circumstances" a confession may not be obtained from a child prior to notifying his parents or relatives and releasing the child either to them or to the Family Court.[82]  In *In the Matters of Gregory W. and Gerald S.,* referred to above, the New York Court of Appeals held that the privilege against self-incrimination applies in juvenile delinquency cases and requires the exclusion of involuntary confessions, and that *People* v. *Lewis,* 260 N. Y. 171, 183 N. E. 353

[79] See also *Malloy* v. *Hogan,* 378 U. S. 1 (1964); *McCarthy* v. *Arndstein,* 266 U. S. 34, 40 (1924).

[80] N. Y. Family Court Act § 741.

[81] N. Y. Family Court Act § 724 (a). In *In the Matter of Williams,* 49 Misc. 2d 154, 267 N. Y. S. 2d 91 (1966), the New York Family Court held that "The failure of the police to notify this child's parents that he had been taken into custody, if not alone sufficient to render his confession inadmissible, is germane on the issue of its voluntary character . . . ." *Id.,* at 165, 267 N. Y. S. 2d, at 106. The confession was held involuntary and therefore inadmissible.

[82] N. Y. Family Court Act § 724 (as amended 1963, see Supp. 1966). See *In the Matter of Addison,* 20 App. Div. 2d 90, 245 N. Y. S. 2d 243 (1963).

(1932), holding the contrary, had been specifically over-ruled by statute.

The authoritative "Standards for Juvenile and Family Courts" concludes that, "Whether or not transfer to the criminal court is a possibility, certain procedures should always be followed. Before being interviewed [by the police], the child and his parents should be informed of his right to have legal counsel present and to refuse to answer questions or be fingerprinted [83] if he should so decide." [84]

Against the application to juveniles of the right to silence, it is argued that juvenile proceedings are "civil" and not "criminal," and therefore the privilege should not apply. It is true that the statement of the privilege in the Fifth Amendment, which is applicable to the States by reason of the Fourteenth Amendment, is that no person "shall be compelled in any *criminal case* to be a witness against himself." However, it is also clear that the availability of the privilege does not turn upon the type of proceeding in which its protection is invoked, but upon the nature of the statement or admission and the exposure which it invites. The privilege may, for example, be claimed in a civil or administrative proceeding, if the statement is or may be inculpatory. [85]

It would be entirely unrealistic to carve out of the Fifth Amendment all statements by juveniles on the ground that these cannot lead to "criminal" involvement. In the first place, juvenile proceedings to determine "delinquency," which may lead to commitment to a state institution, must be regarded as "criminal" for purposes of the privilege against self-incrimination. To hold

---

[83] The issues relating to fingerprinting of juveniles are not presented here, and we express no opinion concerning them.

[84] Standards, p. 49.

[85] See n. 79, *supra,* and accompanying text.

otherwise would be to disregard substance because of the feeble enticement of the "civil" label-of-convenience which has been attached to juvenile proceedings. Indeed, in over half of the States, there is not even assurance that the juvenile will be kept in separate institutions, apart from adult "criminals." In those States juveniles may be placed in or transferred to adult penal institutions [86] after having been found "delinquent" by a juvenile court. For this purpose, at least, commitment is a deprivation of liberty. It is incarceration against one's will, whether it is called "criminal" or "civil." And our Constitution guarantees that no person shall be "compelled" to be a witness against himself when he is threatened with deprivation of his liberty—a command which this Court has broadly applied and generously implemented in accordance with the teaching of the history of the privilege and its great office in mankind's battle for freedom.[87]

In addition, apart from the equivalence for this purpose of exposure to commitment as a juvenile delinquent and exposure to imprisonment as an adult offender, the fact of the matter is that there is little or no assurance in Arizona, as in most if not all of the States, that a juvenile apprehended and interrogated by the police or even by the Juvenile Court itself will remain outside of the reach of adult courts as a consequence of the offense for which he has been taken into custody. In Arizona, as in other States, provision is made for Juvenile Courts to relinquish

[86] Delinquent Children in Penal Institutions, Children's Bureau Pub. No. 415—1964, p. 1.

[87] See, e. g., Miranda v. Arizona, 384 U. S. 436 (1966); Garrity v. New Jersey, 385 U. S. 493 (1967); Spevack v. Klein, 385 U. S. 511 (1967); Haynes v. Washington, 373 U. S. 503 (1963); Culombe v. Connecticut, 367 U. S. 568 (1961); Rogers v. Richmond, 365 U. S. 534 (1961); Malloy v. Hogan, 378 U. S. 1 (1964); Griffin v. California, 380 U. S. 609 (1965).

or waive jurisdiction to the ordinary criminal courts.[88] In the present case, when Gerald Gault was interrogated concerning violation of a section of the Arizona Criminal Code, it could not be certain that the Juvenile Court Judge would decide to "suspend" criminal prosecution in court for adults by proceeding to an adjudication in Juvenile Court.[89]

It is also urged, as the Supreme Court of Arizona here asserted, that the juvenile and presumably his parents should not be advised of the juvenile's right to silence because confession is good for the child as the commencement of the assumed therapy of the juvenile court process, and he should be encouraged to assume an attitude of trust and confidence toward the officials of the juvenile process. This proposition has been subjected to widespread challenge on the basis of current reappraisals of the rhetoric and realities of the handling of juvenile offenders.

In fact, evidence is accumulating that confessions by juveniles do not aid in "individualized treatment," as the court below put it, and that compelling the child to answer questions, without warning or advice as to his right to remain silent, does not serve this or any other good purpose. In light of the observations of Wheeler and Cottrell,[90] and others, it seems probable that where children are induced to confess by "paternal" urgings on the part of officials and the confession is then fol-

---

[88] Arizona Constitution, Art. 6, § 15 (as amended 1960); ARS §§ 8–223, 8–228 (A); Harvard Law Review Note, p. 793. Because of this possibility that criminal jurisdiction may attach it is urged that ". . . all of the procedural safeguards in the criminal law should be followed." Standards, p. 49. Cf. *Harling* v. *United States,* 111 U. S. App. D. C. 174, 295 F. 2d 161 (1961).

[89] ARS § 8–228 (A).

[90] Juvenile Delinquency—Its Prevention and Control (Russell Sage Foundation, 1966).

lowed by disciplinary action, the child's reaction is likely to be hostile and adverse—the child may well feel that he has been led or tricked into confession and that despite his confession, he is being punished.[91]

Further, authoritative opinion has cast formidable doubt upon the reliability and trustworthiness of "confessions" by children. This Court's observations in *Haley* v. *Ohio* are set forth above. The recent decision of the New York Court of Appeals referred to above, *In the Matters of Gregory W. and Gerald S.*, deals with a dramatic and, it is to be hoped, extreme example. Two 12-year-old Negro boys were taken into custody for the brutal assault and rape of two aged domestics, one of whom died as the result of the attack. One of the boys was schizophrenic and had been locked in the security ward of a mental institution at the time of the attacks. By a process that may best be described as bizarre, his confession was obtained by the police. A psychiatrist testified that the boy would admit "whatever he thought was expected so that he could get out of the immediate situation." The other 12-year-old also "confessed." Both confessions were in specific detail, albeit they contained various inconsistencies. The Court of Appeals, in an opinion by Keating, J., concluded that the confessions were products of the will of the police instead of the boys. The confessions were therefore held involuntary and the order of the Appellate Division affirming the order of the Family Court adjudging the defendants to be juvenile delinquents was reversed.

A similar and equally instructive case has recently been decided by the Supreme Court of New Jersey. *In the Interests of Carlo and Stasilowicz, supra.* The body of a 10-year-old girl was found. She had been strangled. Neighborhood boys who knew the girl were questioned.

[91] *Id.,* at 33. See also the other materials cited in n. 37, *supra.*

The two appellants, aged 13 and 15, confessed to the police, with vivid detail and some inconsistencies. At the Juvenile Court hearing, both denied any complicity in the killing. They testified that their confessions were the product of fear and fatigue due to extensive police grilling. The Juvenile Court Judge found that the confessions were voluntary and admissible. On appeal, in an extensive opinion by Proctor, J., the Supreme Court of New Jersey reversed. It rejected the State's argument that the constitutional safeguard of voluntariness governing the use of confessions does not apply in proceedings before the Juvenile Court. It pointed out that under New Jersey court rules, juveniles under the age of 16 accused of committing a homicide are tried in a proceeding which "has all of the appurtenances of a criminal trial," including participation by the county prosecutor, and requirements that the juvenile be provided with counsel, that a stenographic record be made, etc. It also pointed out that under New Jersey law, the confinement of the boys after reaching age 21 could be extended until they had served the maximum sentence which could have been imposed on an adult for such a homicide, here found to be second-degree murder carrying up to 30 years' imprisonment.[92] The court concluded that the confessions were involuntary, stressing that the boys, contrary to statute, were placed in the police station and there interrogated;[93] that the parents of both boys were not allowed to see them while they

---

[92] N. J. Rev. Stat. § 2A:4–37 (b)(2) (Supp. 1966); N. J. Rev. Stat. § 2A:113–4.

[93] N. J. Rev. Stat. § 2A:4–32–33. The court emphasized that the "frightening atmosphere" of a police station is likely to have "harmful effects on the mind and will of the boy," citing *In the Matter of Rutane*, 37 Misc. 2d 234, 234 N. Y. S. 2d 777 (Fam. Ct. Kings County, 1962).

were being interrogated;[94] that inconsistencies appeared among the various statements of the boys and with the objective evidence of the crime; and that there were protracted periods of questioning. The court noted the State's contention that both boys were advised of their constitutional rights before they made their statements, but it held that this should not be given "significant weight in our determination of voluntariness."[95] Accordingly, the judgment of the Juvenile Court was reversed.

In a recent case before the Juvenile Court of the District of Columbia, Judge Ketcham rejected the proffer of evidence as to oral statements made at police headquarters by four juveniles who had been taken into custody for alleged involvement in an assault and attempted robbery. *In the Matter of Four Youths,* Nos. 28–776–J, 28–778–J, 28–783–J, 28–859–J, Juvenile Court of the District of Columbia, April 7, 1961. The court explicitly stated that it did not rest its decision on a showing that

---

[94] The court held that this alone might be enough to show that the confessions were involuntary "even though, as the police testified, the boys did not wish to see their parents" (citing *Gallegos* v. *Colorado,* 370 U. S. 49 (1962)).

[95] The court quoted the following passage from *Haley* v. *Ohio, supra,* at 601:

"But we are told that this boy was advised of his constitutional rights before he signed the. confession and that, knowing them, he nevertheless confessed. That assumes, however, that a boy of fifteen, without aid of counsel, would have a full appreciation of that advice and that on the facts of this record he had a freedom of choice. We cannot indulge those assumptions. Moreover, we cannot give any weight to recitals which merely formalize constitutional requirements. Formulas of respect for constitutional safeguards cannot prevail over the facts of life which contradict them. They may not become a cloak for inquisitorial practices and make an empty form of the due process of law for which free men fought and died to obtain."

the statements were involuntary, but because they were untrustworthy. Judge Ketcham said:

> "Simply stated, the Court's decision in this case rests upon the considered opinion—after nearly four busy years on the Juvenile Court bench during which the testimony of thousands of such juveniles has been heard—that the statements of adolescents under 18 years of age who are arrested and charged with violations of law are frequently untrustworthy and often distort the truth."

We conclude that the constitutional privilege against self-incrimination is applicable in the case of juveniles as it is with respect to adults. We appreciate that special problems may arise with respect to waiver of the privilege by or on behalf of children, and that there may well be some differences in technique—but not in principle—depending upon the age of the child and the presence and competence of parents. The participation of counsel will, of course, assist the police, Juvenile Courts and appellate tribunals in administering the privilege. If counsel was not present for some permissible reason when an admission was obtained, the greatest care must be taken to assure that the admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair.[96]

---

[96] The N. Y. Family Court Act § 744 (b) provides that "an uncorroborated confession made out of court by a respondent is not sufficient" to constitute the required "preponderance of the evidence."

See *United States* v. *Morales,* 233 F. Supp. 160 (D. C. Mont. 1964), holding a confession inadmissible in proceedings under the Federal Juvenile Delinquency Act (18 U. S. C. § 5031 *et seq.*) because, in the circumstances in which it was made, the District Court could

The "confession" of Gerald Gault was first obtained by Officer Flagg, out of the presence of Gerald's parents, without counsel and without advising him of his right to silence, as far as appears. The judgment of the Juvenile Court was stated by the judge to be based on Gerald's admissions in court. Neither "admission" was reduced to writing, and, to say the least, the process by which the "admissions" were obtained and received must be characterized as lacking the certainty and order which are required of proceedings of such formidable consequences.[97] Apart from the "admissions," there was nothing upon which a judgment or finding might be based. There was no sworn testimony. Mrs. Cook, the complainant, was not present. The Arizona Supreme Court held that "sworn testimony must be required of all witnesses including police officers, probation officers and others who are part of or officially related to the juvenile court structure." We hold that this is not enough. No reason is suggested or appears for a different rule in respect of sworn testimony in juvenile courts than in adult tribunals. Absent a valid confession adequate to support the determination of the Juvenile Court, confrontation and sworn testimony by witnesses available for cross-examination were essential for a finding of "delinquency" and an order committing Gerald to a state institution for a maximum of six years.

The recommendations in the Children's Bureau's "Standards for Juvenile and Family Courts" are in general accord with our conclusions. They state that testimony should be under oath and that only competent, material and relevant evidence under rules applicable

---

not conclude that it "was freely made while Morales was afforded all of the requisites of due process required in the case of a sixteen year old boy of his experience." *Id.*, at 170.

[97] Cf. *Jackson* v. *Denno*, 378 U. S. 368 (1964); *Miranda* v. *Arizona*, 384 U. S. 436 (1966).

to civil cases should be admitted in evidence.[98] The New York Family Court Act contains a similar provision.[99]

As we said in *Kent* v. *United States,* 383 U. S. 541, 554 (1966), with respect to waiver proceedings, "there is no place in our system of law for reaching a result of such tremendous consequences without ceremony . . . ." We now hold that, absent a valid confession, a determination of delinquency and an order of commitment to a state institution cannot be sustained in the absence of sworn testimony subjected to the opportunity for cross-examination in accordance with our law and constitutional requirements.

## VI.

### APPELLATE REVIEW AND TRANSCRIPT OF PROCEEDINGS.

Appellants urge that the Arizona statute is unconstitutional under the Due Process Clause because, as construed by its Supreme Court, "there is no right of appeal

---

[98] Standards, pp. 72–73. The Nat'l Crime Comm'n Report concludes that "the evidence admissible at the adjudicatory hearing should be so limited that findings are not dependent upon or unduly influenced by hearsay, gossip, rumor, and other unreliable types of information. To minimize the danger that adjudication will be affected by inappropriate considerations, social investigation reports should not be made known to the judge in advance of adjudication." *Id.,* at 87 (bold face eliminated). See also Note, Rights and Rehabilitation in the Juvenile Courts, 67 Col. L. Rev. 281, 336 (1967): "At the adjudication stage, the use of clearly incompetent evidence in order to prove the youth's involvement in the alleged misconduct . . . is not justifiable. Particularly in delinquency cases, where the issue of fact is the commission of a crime, the introduction of hearsay—such as the report of a policeman who did not witness the events—contravenes the purposes underlying the sixth amendment right of confrontation." (Footnote omitted.)

[99] N. Y. Family Court Act § 744 (a). See also Harvard Law Review Note, p. 795. Cf. *Willner* v. *Committee on Character,* 373 U. S. 96 (1963).

58

from a juvenile court order . . . ." The court held that there is no right to a transcript because there is no right to appeal and because the proceedings are confidential and any record must be destroyed after a prescribed period of time.[100] Whether a transcript or other recording is made, it held, is a matter for the discretion of the juvenile court.

This Court has not held that a State is required by the Federal Constitution "to provide appellate courts or a right to appellate review at all."[101] In view of the fact that we must reverse the Supreme Court of Arizona's affirmance of the dismissal of the writ of habeas corpus for other reasons, we need not rule on this question in the present case or upon the failure to provide a transcript or recording of the hearings—or, indeed, the failure of the Juvenile Judge to state the grounds for his conclusion. Cf. *Kent* v. *United States, supra,* at 561, where we said, in the context of a decision of the juvenile court waiving jurisdiction to the adult court, which by local law, was permissible: ". . . it is incumbent upon the Juvenile Court to accompany its waiver order with a statement of the reasons or considerations therefor." As the present case illustrates, the consequences of failure to provide an appeal, to record the proceedings, or to make findings or state the grounds for the juvenile court's conclusion may be to throw a burden upon the machinery for habeas corpus, to saddle the reviewing process with the burden of attempting to reconstruct a record, and to impose upon the Juvenile Judge the unseemly duty of testifying under cross-examination as to the events that transpired in the hearings before him.[102]

---

[100] ARS § 8–238.

[101] *Griffin* v. *Illinois,* 351 U. S. 12, 18 (1956).

[102] "Standards for Juvenile and Family Courts" recommends "written findings of fact, some form of record of the hearing" "and the right to appeal." Standards, p. 8. It recommends verbatim record-

For the reasons stated, the judgment of the Supreme Court of Arizona is reversed and the cause remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

Mr. Justice Black, concurring.

The juvenile court laws of Arizona and other States, as the Court points out, are the result of plans promoted by humane and forward-looking people to provide a system of courts, procedures, and sanctions deemed to be less harmful and more lenient to children than to adults. For this reason such state laws generally provide less formal and less public methods for the trial of children. In line with this policy, both courts and legislators have shrunk back from labeling these laws as "criminal" and have preferred to call them "civil." This, in part, was to prevent the full application to juvenile court cases of the Bill of Rights safeguards, including notice as provided in the Sixth Amendment,[1] the right to counsel guaranteed by the Sixth,[2] the right against self-

---

ing of the hearing by stenotypist or mechanical recording (p. 76) and urges that the judge make clear to the child and family their right to appeal (p. 78). See also, Standard Family Court Act §§ 19, 24, 28; Standard Juvenile Court Act §§ 19, 24, 28. The Harvard Law Review Note, p. 799, states that "The result [of the infrequency of appeals due to absence of record, indigency, etc.] is that juvenile court proceedings are largely unsupervised." The Nat'l Crime Comm'n Report observes, p. 86, that "records make possible appeals which, even if they do not occur, impart by their possibility a healthy atmosphere of accountability."

[1] "In all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation . . . ." Also requiring notice is the Fifth Amendment's provision that "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury . . . ."

[2] "In all criminal prosecutions, the accused shall . . . have the Assistance of Counsel in his defence."

incrimination guaranteed by the Fifth,[3] and the right
to confrontation guaranteed by the Sixth.[4]  The Court
here holds, however, that these four Bill of Rights safe-
guards apply to protect a juvenile accused in a juvenile
court on a charge under which he can be imprisoned for
a term of years.  This holding strikes a well-nigh fatal
blow to much that is unique about the juvenile courts
in the Nation.  For this reason, there is much to be said
for the position of my Brother STEWART that we should
not pass on all these issues until they are more squarely
presented.  But since the majority of the Court chooses
to decide all of these questions, I must either do the same
or leave my views unexpressed on the important issues
determined.  In these circumstances, I feel impelled to
express my views.

The juvenile court planners envisaged a system that
would practically immunize juveniles from "punishment"
for "crimes" in an effort to save them from youthful
indiscretions and stigmas due to criminal charges or con-
victions.  I agree with the Court, however, that this
exalted ideal has failed of achievement since the begin-
ning of the system.  Indeed, the state laws from the
first one on contained provisions, written in emphatic
terms, for arresting and charging juveniles with viola-
tions of state criminal laws, as well as for taking juveniles
by force of law away from their parents and turning
them over to different individuals or groups or for con-
finement within some state school or institution for a
number of years.  The latter occurred in this case.
Young Gault was arrested and detained on a charge of
violating an Arizona penal law by using vile and offensive
language to a lady on the telephone.  If an adult, he

---

[3] "No person . . . shall be compelled in any criminal case to be
a witness against himself . . . ."

[4] "In all criminal prosecutions, the accused shall enjoy the right . . .
to be confronted with the witnesses against him . . . ."

could only have been fined or imprisoned for two months for his conduct. As a juvenile, however, he was put through a more or less secret, informal hearing by the court, after which he was ordered, or, more realistically, "sentenced," to confinement in Arizona's Industrial School until he reaches 21 years of age. Thus, in a juvenile system designed to lighten or avoid punishment for criminality, he was ordered by the State to six years' confinement in what is in all but name a penitentiary or jail.

Where a person, infant or adult, can be seized by the State, charged, and convicted for violating a state criminal law, and then ordered by the State to be confined for six years, I think the Constitution requires that he be tried in accordance with the guarantees of all the provisions of the Bill of Rights made applicable to the States by the Fourteenth Amendment. Undoubtedly this would be true of an adult defendant, and it would be a plain denial of equal protection of the laws—an invidious discrimination—to hold that others subject to heavier punishments could, because they are children, be denied these same constitutional safeguards. I consequently agree with the Court that the Arizona law as applied here denied to the parents and their son the right of notice, right to counsel, right against self-incrimination, and right to confront the witnesses against young Gault. Appellants are entitled to these rights, not because "fairness, impartiality and orderliness—in short, the essentials of due process"—require them and not because they are "the procedural rules which have been fashioned from the generality of due process," but because they are specifically and unequivocally granted by provisions of the Fifth and Sixth Amendments which the Fourteenth Amendment makes applicable to the States.

A few words should be added because of the opinion of my Brother HARLAN who rests his concurrence and

dissent on the Due Process Clause alone. He reads that clause alone as allowing this Court "to determine what forms of procedural protection are necessary to guarantee the fundamental fairness of juvenile proceedings" "in a fashion consistent with the 'traditions and conscience of our people.'" Cf. *Rochin* v. *California*, 342 U. S. 165. He believes that the Due Process Clause gives this Court the power, upon weighing a "compelling public interest," to impose on the States only those specific constitutional rights which the Court deems "imperative" and "necessary" to comport with the Court's notions of "fundamental fairness."

I cannot subscribe to any such interpretation of the Due Process Clause. Nothing in its words or its history permits it, and "fair distillations of relevant judicial history" are no substitute for the words and history of the clause itself. The phrase "due process of law" has through the years evolved as the successor in purpose and meaning to the words "law of the land" in Magna Charta which more plainly intended to call for a trial according to the existing law of the land in effect at the time an alleged offense had been committed. That provision in Magna Charta was designed to prevent defendants from being tried according to criminal laws or proclamations specifically promulgated to fit particular cases or to attach new consequences to old conduct. Nothing done since Magna Charta can be pointed to as intimating that the Due Process Clause gives courts power to fashion laws in order to meet new conditions, to fit the "decencies" of changed conditions, or to keep their consciences from being shocked by legislation, state or federal.

And, of course, the existence of such awesome judicial power cannot be buttressed or created by relying on the word "procedural." Whether labeled as "procedural" or "substantive," the Bill of Rights safeguards, far from

being mere "tools with which" other unspecified "rights could be fully vindicated," are the very vitals of a sound constitutional legal system designed to protect and safeguard the most cherished liberties of a free people. These safeguards were written into our Constitution not by judges but by Constitution makers. Freedom in this Nation will be far less secure the very moment that it is decided that judges can determine which of these safeguards "should" or "should not be imposed" according to their notions of what constitutional provisions are consistent with the "traditions and conscience of our people." Judges with such power, even though they profess to "proceed with restraint," will be above the Constitution, with power to write it, not merely to interpret it, which I believe to be the only power constitutionally committed to judges.

There is one ominous sentence, if not more, in my Brother HARLAN's opinion which bodes ill, in my judgment, both for legislative programs and constitutional commands. Speaking of procedural safeguards in the Bill of Rights, he says:

> "These factors in combination suggest that legislatures may properly expect only a cautious deference for their procedural judgments, but that, conversely, courts must exercise their special responsibility for procedural guarantees with care to permit ample scope for achieving the purposes of legislative programs. . . . [T]he court should necessarily proceed with restraint."

It is to be noted here that this case concerns Bill of Rights Amendments; that the "procedure" power my Brother HARLAN claims for the Court here relates solely to Bill of Rights safeguards; and that he is here claiming for the Court a supreme power to fashion new Bill of Rights safeguards according to the Court's notions of

what fits tradition and conscience. I do not believe that the Constitution vests any such power in judges, either in the Due Process Clause or anywhere else. Consequently, I do not vote to invalidate this Arizona law on the ground that it is "unfair" but solely on the ground that it violates the Fifth and Sixth Amendments made obligatory on the States by the Fourteenth Amendment. Cf. *Pointer* v. *Texas,* 380 U. S. 400, 412 (Goldberg, J., concurring). It is enough for me that the Arizona law as here applied collides head-on with the Fifth and Sixth Amendments in the four respects mentioned. The only relevance to me of the Due Process Clause is that it would, of course, violate due process or the "law of the land" to enforce a law that collides with the Bill of Rights.

Mr. Justice White, concurring.

I join the Court's opinion except for Part V. I also agree that the privilege against compelled self-incrimination applies at the adjudicatory stage of juvenile court proceedings. I do not, however, find an adequate basis in the record for determining whether that privilege was violated in this case. The Fifth Amendment protects a person from being "compelled" in any criminal proceeding to be a witness against himself. Compulsion is essential to a violation. It may be that when a judge, armed with the authority he has or which people think he has, asks questions of a party or a witness in an adjudicatory hearing, that person, especially if a minor, would feel compelled to answer, absent a warning to the contrary or similar information from some other source. The difficulty is that the record made at the habeas corpus hearing, which is the only information we have concerning the proceedings in the juvenile court, does not directly inform us whether Gerald Gault or his parents were told of Gerald's right to remain silent; nor does it reveal whether the parties

were aware of the privilege from some other source, just as they were already aware that they had the right to have the help of counsel and to have witnesses on their behalf. The petition for habeas corpus did not raise the Fifth Amendment issue nor did any of the witnesses focus on it.

I have previously recorded my views with respect to what I have deemed unsound applications of the Fifth Amendment. See, for example, *Miranda* v. *Arizona*, 384 U. S. 436, 526, and *Malloy* v. *Hogan*, 378 U. S. 1, 33, dissenting opinions. These views, of course, have not prevailed. But I do hope that the Court will proceed with some care in extending the privilege, with all its vigor, to proceedings in juvenile court, particularly the nonadjudicatory stages of those proceedings.

In any event, I would not reach the Fifth Amendment issue here. I think the Court is clearly ill-advised to review this case on the basis of *Miranda* v. *Arizona*, since the adjudication of delinquency took place in 1964, long before the *Miranda* decision. See *Johnson* v. *New Jersey*, 384 U. S. 719. Under these circumstances, this case is a poor vehicle for resolving a difficult problem. Moreover, no prejudice to appellants is at stake in this regard. The judgment below must be reversed on other grounds and in the event further proceedings are to be had, Gerald Gault will have counsel available to advise him.

For somewhat similar reasons, I would not reach the questions of confrontation and cross-examination which are also dealt with in Part V of the opinion.

MR. JUSTICE HARLAN, concurring in part and dissenting in part.

Each of the 50 States has created a system of juvenile or family courts, in which distinctive rules are employed and special consequences imposed. The jurisdiction of

these courts commonly extends both to cases which the States have withdrawn from the ordinary processes of criminal justice, and to cases which involve acts that, if performed by an adult, would not be penalized as criminal. Such courts are denominated civil, not criminal, and are characteristically said not to administer criminal penalties. One consequence of these systems, at least as Arizona construes its own, is that certain of the rights guaranteed to criminal defendants by the Constitution are withheld from juveniles. This case brings before this Court for the first time the question of what limitations the Constitution places upon the operation of such tribunals.[1] For reasons which follow, I have concluded that the Court has gone too far in some respects, and fallen short in others, in assessing the procedural requirements demanded by the Fourteenth Amendment.

## I.

I must first acknowledge that I am unable to determine with any certainty by what standards the Court decides that Arizona's juvenile courts do not satisfy the obligations of due process. The Court's premise, itself the product of reasoning which is not described, is that the "constitutional and theoretical basis" of state systems of juvenile and family courts is "debatable"; it buttresses these doubts by marshaling a body of opinion which suggests that the accomplishments of these courts have often fallen short of expectations.[2] The Court does not

---

[1] *Kent* v. *United States*, 383 U. S. 541, decided at the 1965 Term, did not purport to rest on constitutional grounds.

[2] It is appropriate to observe that, whatever the relevance the Court may suppose that this criticism has to present issues, many of the critics have asserted that the deficiencies of juvenile courts have stemmed chiefly from the inadequacy of the personnel and resources available to those courts. See, *e. g.*, Paulsen, Kent v. United States: The Constitutional Context of Juvenile Cases, 1966

indicate at what points or for what purposes such views, held either by it or by other observers, might be pertinent to the present issues. Its failure to provide any discernible standard for the measurement of due process in relation to juvenile proceedings unfortunately might be understood to mean that the Court is concerned principally with the wisdom of having such courts at àll.

If this is the source of the Court's dissatisfaction, I cannot share it. I should have supposed that the constitutionality of juvenile courts was beyond proper question under the standards now employed to assess the substantive validity of state legislation under the Due Process Clause of the Fourteenth Amendment. It can scarcely be doubted that it is within the State's competence to adopt measures reasonably calculated to meet more effectively the persistent problems of juvenile delinquency; as the opinion for the Court makes abundantly plain, these are among the most vexing and ominous of the concerns which now face communities throughout the country.

The proper issue here is, however, not whether the State may constitutionally treat juvenile offenders through a system of specialized courts, but whether the proceedings in Arizona's juvenile courts include procedural guarantees which satisfy the requirements of the Fourteenth Amendment. Among the first premises of our constitutional system is the obligation to conduct any proceeding in which an individual may be deprived of liberty or property in a fashion consistent with the "traditions and conscience of our people." *Snyder* v. *Massachusetts,* 291 U. S. 97, 105. The importance of these procedural guarantees is doubly intensified here. First, many of the problems with which Arizona is concerned

Sup. Ct. Rev. 167, 191–192; Handler, The Juvenile Court and the Adversary System: Problems of Function and Form, 1965 Wis. L. Rev. 7, 46.

are among those traditionally confined to the processes of criminal justice; their disposition necessarily affects in the most direct and substantial manner the liberty of individual citizens. Quite obviously, systems of specialized penal justice might permit erosion, or even evasion, of the limitations placed by the Constitution upon state criminal proceedings. Second, we must recognize that the character and consequences of many juvenile court proceedings have in fact closely resembled those of ordinary criminal trials. Nothing before us suggests that juvenile courts were intended as a device to escape constitutional constraints, but I entirely agree with the Court that we are nonetheless obliged to examine with circumspection the procedural guarantees the State has provided.

The central issue here, and the principal one upon which I am divided from the Court, is the method by which the procedural requirements of due process should be measured. It must at the outset be emphasized that the protections necessary here cannot be determined by resort to any classification of juvenile proceedings either as criminal or as civil, whether made by the State or by this Court. Both formulae are simply too imprecise to permit reasoned analysis of these difficult constitutional issues. The Court should instead measure the requirements of due process by reference both to the problems which confront the State and to the actual character of the procedural system which the State has created. The Court has for such purposes chiefly examined three connected sources: first, the "settled usages and modes of proceeding," *Murray's Lessee* v. *Hoboken Land & Improvement Co.,* 18 How. 272, 277; second, the "fundamental principles of liberty and justice which lie at the base of all our civil and political institutions," *Hebert* v. *Louisiana,* 272 U. S. 312, 316; and third, the character and requirements of the circumstances presented in each situation. *FCC* v. *WJR,* 337 U. S. 265, 277; *Yakus* v.

*United States,* 321 U. S. 414. See, further, my dissenting opinion in *Poe* v. *Ullman,* 367 U. S. 497, 522, and compare my opinion concurring in the result in *Pointer* v. *Texas,* 380 U. S. 400, 408. Each of these factors is relevant to the issues here, but it is the last which demands particular examination.

The Court has repeatedly emphasized that determination of the constitutionally required procedural safeguards in any situation requires recognition both of the "interests affected" and of the "circumstances involved." *FCC* v. *WJR, supra,* at 277. In particular, a "compelling public interest" must, under our cases, be taken fully into account in assessing the validity under the due process clauses of state or federal legislation and its application. See, *e. g., Yakus* v. *United States, supra,* at 442; *Bowles* v. *Willingham,* 321 U. S. 503, 520; *Miller* v. *Schoene,* 276 U. S. 272, 279. Such interests would never warrant arbitrariness or the diminution of any specifically assured constitutional right, *Home Bldg. & Loan Assn.* v. *Blaisdell,* 290 U. S. 398, 426, but they are an essential element of the context through which the legislation and proceedings under it must be read and evaluated.

No more evidence of the importance of the public interests at stake here is required than that furnished by the opinion of the Court; it indicates that "some 601,000 children under 18, or 2% of all children between 10 and 17, came before juvenile courts" in 1965, and that "about one-fifth of all arrests for serious crimes" in 1965 were of juveniles. The Court adds that the rate of juvenile crime is steadily rising. All this, as the Court suggests, indicates the importance of these due process issues, but it mirrors no less vividly that state authorities are confronted by formidable and immediate problems involving the most fundamental social values. The state legislatures have determined that the most hopeful solution for

these problems is to be found in specialized courts, organized under their own rules and imposing distinctive consequences. The terms and limitations of these systems are not identical, nor are the procedural arrangements which they include, but the States are uniform in their insistence that the ordinary processes of criminal justice are inappropriate, and that relatively informal proceedings, dedicated to premises and purposes only imperfectly reflected in the criminal law, are instead necessary.

It is well settled that the Court must give the widest deference to legislative judgments that concern the character and urgency of the problems with which the State is confronted. Legislatures are, as this Court has often acknowledged, the "main guardian" of the public interest, and, within their constitutional competence, their understanding of that interest must be accepted as "well-nigh" conclusive. *Berman* v. *Parker,* 348 U. S. 26, 32. This principle does not, however, reach all the questions essential to the resolution of this case. The legislative judgments at issue here embrace assessments of the necessity and wisdom of procedural guarantees; these are questions which the Constitution has entrusted at least in part to courts, and upon which courts have been understood to possess particular competence. The fundamental issue here is, therefore, in what measure and fashion the Court must defer to legislative determinations which encompass constitutional issues of procedural protection.

It suffices for present purposes to summarize the factors which I believe to be pertinent. It must first be emphasized that the deference given to legislators upon substantive issues must realistically extend in part to ancillary procedural questions. Procedure at once reflects and creates substantive rights, and every effort of courts since the beginnings of the common law to separate the two has proved essentially futile. The distinction between them is particularly inadequate here, where the

legislature's substantive preferences directly and un-
avoidably require judgments about procedural issues.
The procedural framework is here a principal element
of the substantive legislative system; meaningful defer-
ence to the latter must include a portion of deference to
the former.  The substantive-procedural dichotomy is,
nonetheless, an indispensable tool of analysis, for it stems
from fundamental limitations upon judicial authority
under the Constitution.  Its premise is ultimately that
courts may not substitute for the judgments of legislators
their own understanding of the public welfare, but must
instead concern themselves with the validity under the
Constitution of the methods which the legislature has
selected.  See, e. g., McLean v. Arkansas, 211 U. S. 539,
547; Olsen v. Nebraska, 313 U. S. 236, 246–247.  The
Constitution has in this manner created for courts and
legislators areas of primary responsibility which are essen-
tially congruent to their areas of special competence.
Courts are thus obliged both by constitutional command
and by their distinctive functions to bear particular
responsibility for the measurement of procedural due
process.  These factors in combination suggest that legis-
latures may properly expect only a cautious deference
for their procedural judgments, but that, conversely,
courts must exercise their special responsibility for pro-
cedural guarantees with care to permit ample scope for
achieving the purposes of legislative programs.  Plainly,
courts can exercise such care only if they have in each
case first studied thoroughly the objectives and imple-
mentation of the program at stake; if, upon completion
of those studies, the effect of extensive procedural restric-
tions upon valid legislative purposes cannot be assessed
with reasonable certainty, the court should necessarily
proceed with restraint.

The foregoing considerations, which I believe to be
fair distillations of relevant judicial history, suggest

three criteria by which the procedural requirements of due process should be measured here: first, no more restrictions should be imposed than are imperative to assure the proceedings' fundamental fairness; second, the restrictions which are imposed should be those which preserve, so far as possible, the essential elements of the State's purpose; and finally, restrictions should be chosen which will later permit the orderly selection of any additional protections which may ultimately prove necessary. In this way, the Court may guarantee the fundamental fairness of the proceeding, and yet permit the State to continue development of an effective response to the problems of juvenile crime.

## II.

Measured by these criteria, only three procedural requirements should, in my opinion, now be deemed required of state juvenile courts by the Due Process Clause of the Fourteenth Amendment: first, timely notice must be provided to parents and children of the nature and terms of any juvenile court proceeding in which a determination affecting their rights or interests may be made; second, unequivocal and timely notice must be given that counsel may appear in any such proceeding in behalf of the child and its parents, and that in cases in which the child may be confined in an institution, counsel may, in circumstances of indigency, be appointed for them; and third, the court must maintain a written record, or its equivalent, adequate to permit effective review on appeal or in collateral proceedings. These requirements would guarantee to juveniles the tools with which their rights could be fully vindicated, and yet permit the States to pursue without unnecessary hindrance the purposes which they believe imperative in this field. Further, their imposition now would later

permit more intelligent assessment of the necessity under the Fourteenth Amendment of additional requirements, by creating suitable records from which the character and deficiencies of juvenile proceedings could be accurately judged. I turn to consider each of these three requirements.

The Court has consistently made plain that adequate and timely notice is the fulcrum of due process, whatever the purposes of the proceeding. See, *e. g., Roller* v. *Holly,* 176 U. S. 398, 409; *Coe* v. *Armour Fertilizer Works,* 237 U. S. 413, 424. Notice is ordinarily the prerequisite to effective assertion of any constitutional or other rights; without it, vindication of those rights must be essentially fortuitous. So fundamental a protection can neither be spared here nor left to the "favor or grace" of state authorities. *Central of Georgia Ry.* v. *Wright,* 207 U. S. 127, 138; *Coe* v. *Armour Fertilizer Works, supra,* at 425.

Provision of counsel and of a record, like adequate notice, would permit the juvenile to assert very much more effectively his rights and defenses, both in the juvenile proceedings and upon direct or collateral review. The Court has frequently emphasized their importance in proceedings in which an individual may be deprived of his liberty, see *Gideon* v. *Wainwright,* 372 U. S. 335, and *Griffin* v. *Illinois,* 351 U. S. 12; this reasoning must include with special force those who are commonly inexperienced and immature. See *Powell* v. *Alabama,* 287 U. S. 45. The facts of this case illustrate poignantly the difficulties of review without either an adequate record or the participation of counsel in the proceeding's initial stages. At the same time, these requirements should not cause any substantial modification in the character of juvenile court proceedings: counsel, although now present in only a small percentage of juvenile cases, have apparently already appeared without

incident in virtually all juvenile courts; [3] and the maintenance of a record should not appreciably alter the conduct of these proceedings.

The question remains whether certain additional requirements, among them the privilege against self-incrimination, confrontation, and cross-examination, must now, as the Court holds, also be imposed. I share in part the views expressed in my Brother WHITE's concurring opinion, but believe that there are other, and more deep-seated, reasons to defer, at least for the present, the imposition of such requirements.

Initially, I must vouchsafe that I cannot determine with certainty the reasoning by which the Court concludes that these further requirements are now imperative. The Court begins from the premise, to which it gives force at several points, that juvenile courts need not satisfy "all of the requirements of a criminal trial." It therefore scarcely suffices to explain the selection of these particular procedural requirements for the Court to declare that juvenile court proceedings are essentially criminal, and thereupon to recall that these are requisites for a criminal trial. Nor does the Court's voucher of "authoritative opinion," which consists of four extraordinary juvenile cases, contribute materially to the solution of these issues. The Court has, even under its own premises, asked the wrong questions: the problem here is to determine what forms of procedural protection are necessary to guarantee the fundamental fairness of juvenile proceedings, and not which of the procedures now employed in criminal trials should be transplanted intact to proceedings in these specialized courts.

---

[3] The statistical evidence here is incomplete, but see generally Skoler & Tenney, Attorney Representation in Juvenile Court, 4 J. Fam. Law 77. They indicate that some 91% of the juvenile court judges whom they polled favored representation by counsel in their courts. *Id.*, at 88.

In my view, the Court should approach this question in terms of the criteria, described above, which emerge from the history of due process adjudication. Measured by them, there are compelling reasons at least to defer imposition of these additional requirements. First, quite unlike notice, counsel, and a record, these requirements might radically alter the character of juvenile court proceedings. The evidence from which the Court reasons that they would not is inconclusive,[4] and other available evidence suggests that they very likely would.[5] At the least, it is plain that these additional requirements would contribute materially to the creation in these proceedings of the atmosphere of an ordinary criminal trial, and would, even if they do no more, thereby largely frustrate a central purpose of these specialized courts. Further, these are restrictions intended to conform to the demands of an intensely adversary system of criminal justice; the broad purposes which they represent might be served in juvenile courts with equal effectiveness by procedural devices more consistent with the premises of proceedings

---

[4] Indeed, my Brother BLACK candidly recognizes that such is apt to be the effect of today's decision, ante, p. 60. The Court itself is content merely to rely upon inapposite language from the recommendations of the Children's Bureau, plus the terms of a single statute.

[5] The most cogent evidence of course consists of the steady rejection of these requirements by state legislatures and courts. The wide disagreement and uncertainty upon this question are also reflected in Paulsen, Kent v. United States: The Constitutional Context of Juvenile Cases, 1966 Sup. Ct. Rev. 167, 186, 191. See also Paulsen, Fairness to the Juvenile Offender, 41 Minn. L. Rev. 547, 561–562; McLean, An Answer to the Challenge of Kent, 53 A. B. A. J. 456, 457; Alexander, Constitutional Rights in Juvenile Court, 46 A. B. A. J. 1206; Shears, Legal Problems Peculiar to Children's Courts, 48 A. B. A. J. 719; Siler, The Need for Defense Counsel in the Juvenile Court, 11 Crime & Delin. 45, 57–58. Compare Handler, The Juvenile Court and the Adversary System: Problems of Function and Form, 1965 Wis. L. Rev. 7, 32.

in those courts. As the Court apparently acknowledges, the hazards of self-accusation, for example, might be avoided in juvenile proceedings without the imposition of all the requirements and limitations which surround the privilege against self-incrimination. The guarantee of adequate notice, counsel, and a record would create conditions in which suitable alternative procedures could be devised; but, unfortunately, the Court's haste to impose restrictions taken intact from criminal procedure may well seriously hamper the development of such alternatives. Surely this illustrates that prudence and the principles of the Fourteenth Amendment alike require that the Court should now impose no more procedural restrictions than are imperative to assure fundamental fairness, and that the States should instead be permitted additional opportunities to develop without unnecessary hindrance their systems of juvenile courts.

I find confirmation for these views in two ancillary considerations. First, it is clear that an uncertain, but very substantial number of the cases brought to juvenile courts involve children who are not in any sense guilty of criminal misconduct. Many of these children have simply the misfortune to be in some manner distressed; others have engaged in conduct, such as truancy, which is plainly not criminal.[6] Efforts are now being made to develop effective, and entirely noncriminal, methods of treatment for these children.[7] In such cases, the state authorities

---

[6] Estimates of the number of children in this situation brought before juvenile courts range from 26% to some 48%; variation seems chiefly a product both of the inadequacy of records and of the difficulty of categorizing precisely the conduct with which juveniles are charged. See generally Sheridan, Juveniles Who Commit Noncriminal Acts: Why Treat in a Correctional System? 31 Fed. Probation 26, 27. By any standard, the number of juveniles involved is "considerable." *Ibid*.

[7] *Id*., at 28–30.

are in the most literal sense acting *in loco parentis;* they are, by any standard, concerned with the child's protection, and not with his punishment. I do not question that the methods employed in such cases must be consistent with the constitutional obligation to act in accordance with due process, but certainly the Fourteenth Amendment does not demand that they be constricted by the procedural guarantees devised for ordinary criminal prosecutions. Cf. *Minnesota ex rel. Pearson* v. *Probate Court,* 309 U. S. 270. It must be remembered that the various classifications of juvenile court proceedings are, as the vagaries of the available statistics illustrate, often arbitrary or ambiguous; it would therefore be imprudent, at the least, to build upon these classifications rigid systems of procedural requirements which would be applicable, or not, in accordance with the descriptive label given to the particular proceeding. It is better, it seems to me, to begin by now requiring the essential elements of fundamental fairness in juvenile courts, whatever the label given by the State to the proceeding; in this way the Court could avoid imposing unnecessarily rigid restrictions, and yet escape dependence upon classifications which may often prove to be illusory. Further, the provision of notice, counsel, and a record would permit orderly efforts to determine later whether more satisfactory classifications can be devised, and if they can, whether additional procedural requirements are necessary for them under the Fourteenth Amendment.

Second, it should not be forgotten that juvenile crime and juvenile courts are both now under earnest study throughout the country. I very much fear that this Court, by imposing these rigid procedural requirements, may inadvertently have served to discourage these efforts to find more satisfactory solutions for the problems of juvenile crime, and may thus now hamper enlightened development of the systems of juvenile courts. It is

appropriate to recall that the Fourteenth Amendment does not compel the law to remain passive in the midst of change; to demand otherwise denies "every quality of the law but its age." *Hurtado* v. *California,* 110 U. S. 516, 529.

### III.

Finally, I turn to assess the validity of this juvenile court proceeding under the criteria discussed in this opinion. Measured by them, the judgment below must, in my opinion, fall. Gerald Gault and his parents were not provided adequate notice of the terms and purposes of the proceedings in which he was adjudged delinquent; they were not advised of their rights to be represented by counsel; and no record in any form was maintained of the proceedings. It follows, for the reasons given in this opinion, that Gerald Gault was deprived of his liberty without due process of law, and I therefore concur in the judgment of the Court.

Mr. Justice Stewart, dissenting.

The Court today uses an obscure Arizona case as a vehicle to impose upon thousands of juvenile courts throughout the Nation restrictions that the Constitution made applicable to adversary criminal trials.[1] I believe the Court's decision is wholly unsound as a matter of constitutional law, and sadly unwise as a matter of judicial policy.

Juvenile proceedings are not criminal trials. They are not civil trials. They are simply not adversary proceedings. Whether treating with a delinquent child, a neg-

---

[1] I find it strange that a Court so intent upon fastening an absolute right to counsel upon nonadversary juvenile proceedings has not been willing even to consider whether the Constitution requires a lawyer's help in a criminal prosecution upon a misdemeanor charge. See *Winters* v. *Beck,* 385 U. S. 907; *DeJoseph* v. *Connecticut,* 385 U. S. 982.

lected child, a defective child, or a dependent child, a juvenile proceeding's whole purpose and mission is the very opposite of the mission and purpose of a prosecution in a criminal court. The object of the one is correction of a condition. The object of the other is conviction and punishment for a criminal act.

In the last 70 years many dedicated men and women have devoted their professional lives to the enlightened task of bringing us out of the dark world of Charles Dickens in meeting our responsibilities to the child in our society. The result has been the creation in this century of a system of juvenile and family courts in each of the 50 States. There can be no denying that in many areas the performance of these agencies has fallen disappointingly short of the hopes and dreams of the courageous pioneers who first conceived them. For a variety of reasons, the reality has sometimes not even approached the ideal, and much remains to be accomplished in the administration of public juvenile and family agencies—in personnel, in planning, in financing, perhaps in the formulation of wholly new approaches.

I possess neither the specialized experience nor the expert knowledge to predict with any certainty where may lie the brightest hope for progress in dealing with the serious problems of juvenile delinquency. But I am certain that the answer does not lie in the Court's opinion in this case, which serves to convert a juvenile proceeding into a criminal prosecution.

The inflexible restrictions that the Constitution so wisely made applicable to adversary criminal trials have no inevitable place in the proceedings of those public social agencies known as juvenile or family courts. And to impose the Court's long catalog of requirements upon juvenile proceedings in every area of the country is to invite a long step backwards into the nineteenth century. In that era there were no juvenile proceedings, and a

child was tried in a conventional criminal court with all the trappings of a conventional criminal trial. So it was that a 12-year-old boy named James Guild was tried in New Jersey for killing Catharine Beakes. A jury found him guilty of murder, and he was sentenced to death by hanging. The sentence was executed. It was all very constitutional.[2]

A State in all its dealings must, of course, accord every person due process of law. And due process may require that some of the same restrictions which the Constitution has placed upon criminal trials must be imposed upon juvenile proceedings. For example, I suppose that all would agree that a brutally coerced confession could not constitutionally be considered in a juvenile court hearing. But it surely does not follow that the testimonial privilege against self-incrimination is applicable in all juvenile proceedings.[3] Similarly, due process clearly

---

[2] *State* v. *Guild,* 5 Halst. 163, 18 Am. Dec. 404 (N. J. Sup. Ct.).

"Thus, also, in very modern times, a boy of ten years old was convicted on his own confession of murdering his bed-fellow, there appearing in his whole behavior plain tokens of a mischievous discretion; and as the sparing this boy merely on account of his tender years might be of dangerous consequence to the public, by propagating a notion that children might commit such atrocious crimes with impunity, it was unanimously agreed by all the judges that he was a proper subject of capital punishment." 4 Blackstone, Commentaries 23 (Wendell ed. 1847).

[3] Until June 13, 1966, it was clear that the Fourteenth Amendment's ban upon the use of a coerced confession is constitutionally quite a different thing from the Fifth Amendment's testimonial privilege against self-incrimination. See, for example, the Court's unanimous opinion in *Brown* v. *Mississippi,* 297 U. S. 278, at 285–286, written by Chief Justice Hughes and joined by such distinguished members of this Court as Mr. Justice Brandeis, Mr. Justice Stone, and Mr. Justice Cardozo. See also *Tehan* v. *Shott,* 382 U. S. 406, decided January 19, 1966, where the Court emphasized the "contrast" between "the wrongful use of a coerced confession" and "the Fifth Amendment's privilege against self-incrimination." 382 U. S., at 416. The complete confusion of these separate con-

requires timely notice of the purpose and scope of any proceedings affecting the relationship of parent and child. *Armstrong* v. *Manzo,* 380 U. S. 545. But it certainly does not follow that notice of a juvenile hearing must be framed with all the technical niceties of a criminal indictment. See *Russell* v. *United States,* 369 U. S. 749.

In any event, there is no reason to deal with issues such as these in the present case. The Supreme Court of Arizona found that the parents of Gerald Gault "knew of their right to counsel, to subpoena and cross examine witnesses, of the right to confront the witnesses against Gerald and the possible consequences of a finding of delinquency." 99 Ariz. 181, 185, 407 P. 2d 760, 763. It further found that "Mrs. Gault knew the exact nature of the charge against Gerald from the day he was taken to the detention home." 99 Ariz., at 193, 407 P. 2d, at 768. And, as MR. JUSTICE WHITE correctly points out, pp. 64–65, *ante,* no issue of compulsory self-incrimination is presented by this case.

I would dismiss the appeal.

---

stitutional doctrines in Part V of the Court's opinion today stems, no doubt, from *Miranda* v. *Arizona,* 384 U. S. 436, a decision which I continue to believe was constitutionally erroneous.