542 P.2d 834

In the Matter of John DOE VIII, John Doe IX and John Doe X, children, Defendants-Appellants,

v.

STATE of New Mexico, Plaintiff-Appellee.

No. 1638.

Court of Appeals of New Mexico.

Aug. 20, 1975.

Certiorari Denied Sept. 23, 1975.

For opinion of the Court see 88 N.M. 347, 540 P.2d 827.

HERNANDEZ, Judge (dissenting).

I agree with the majority that, " . . . Lane's observation of the respondent [Doe X], especially his testimony that he saw X place the pipe inside his sweater, provided the necessary probable cause to justify a search and seizure for purposes of maintaining school discipline." I likewise agree that, " . . . it cannot be denied that this action [interrogation and seizure] by a public school official is 'state action' . . . ." But I am not ready to conclude, as do my brothers in the majority, that since the school officials had probable cause to believe an infraction of school discipline, they could proceed to seek to uncover evidence of what they, in a dawning way, came to suspect to be a criminal violation without regard to the constitutional limitations normally required in such investigations. I am unwilling to conclude, as do the majority, that once the "reasonableness" of a seizure has been shown for one purpose, it has *ipse dixit* been shown for all purposes.

Instructive on the unwitting violation of the constitutional rights of juveniles by well intentioned persons is Justice Forta's opinion in *Re Gault,* 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967).

"The early reformers were appalled by adult procedures and penalties, and by the fact that children could be given long prison sentences and mixed in jails with hardened criminals. They were profoundly convinced that society's duty to the child could not be confined by the concept of justice alone. They believed

that society's role was not to ascertain whether the child was 'guilty' or 'innocent', but 'What is he, how has he become what he is, and what had best be done in his interest and in the interest of the state to save him from a downward career.' . . . The apparent rigidities, technicalities, and harshness which they observed in both substantive and procedural criminal law were therefore to be discarded. The idea of crime and punishment was to be abandoned. The child was to be 'treated' and 'rehabilitated' and the procedures, from apprehension through institutionalization, were to be 'clinical' rather than punitive.

"These results were to be achieved, without coming to conceptual and constitutional grief, by insisting that the proceedings were not adversary, but that the state was proceeding as parens patriae. The Latin phrase proved to be a great help to those who sought to rationalize the exclusion of juveniles from the constitutional scheme; but its meaning is murky and its historic credentials are of dubious relevance. The phrase was taken from chancery practice, where, however, it was used to describe the power of the state to act in loco parentis for the purpose of protecting the property interests and the person of the child. But there is no trace of the doctrine in the history of criminal jurisprudence. At common law, children under seven were considered incapable of possessing criminal intent. Beyond that age, they were subjected to arrest, trial, and in theory to punishment like adult offenders. In these old days, the state was not deemed to have authority to accord them fewer procedural rights than adults.

"The right of the state, as parens patriae, to deny to the child procedural rights available to his elders was elaborated by the assertion that a child, unlike an adult, has a right 'not to liberty but to custody.' He can be made to attorn to his parents, to go to school, etc. If his parents default in effectively performing their custodial functions—that is, if the child is 'delinquent'—the state may intervene. In doing so, it does not deprive the child of any rights, because he has none. It merely provides the 'custody' to which the child is entitled. On this basis, proceedings involving juveniles were described as 'civil' not 'criminal' and therefore not subject to the requirements which restrict the state when it seeks to deprive a person of his liberty.

"Accordingly, the highest motives and most enlightened impulses led to a peculiar system for juveniles, unknown to our law in any comparable context. The constitutional and theoretical basis for this peculiar system is—to say the least—debatable. And in practice . . . the results have not been entirely satisfactory. Juvenile Court history has again demonstrated that unbridled discretion, however benevolently motivated, is frequently a poor substitute for principle and procedure. . . . The absence of substantive standards has not necessarily meant that children receive careful, compassionate, individualized treatment. The absence of procedural rules based upon constitutional principle has not always produced fair, efficient, and effective procedures. Departures from established principles of due process have frequently resulted not in enlightened procedure, but in arbitrariness." [Footnotes Omitted.]

The excerpt quoted above well illustrates the error which I believe will be perpetuated by the decision reached by the majority herein.

The case before us presents questions of first impression in New Mexico. Respondent X was seen to have been the last in a line of three or four junior high school students who were smoking between classes, and he was seen to attempt to secrete the pipe that was used after their gym teacher called out to warn that the misbehavior had not gone unobserved. Twenty minutes later, the gym teacher and the assistant prin-

cipal at the school called respondent X out of his class, ushered him to an empty class room and proceeded to question him about the incident. Although both of the adults testified that they could see the pipe bulging from under the respondent's sweater throughout the questioning, the boy feigned innocence and refused to hand over the pipe for forty minutes. In my opinion the rules of the school and the regulation of the State Board of Education certified as number 73–9, and approved on April 27, 1973,[1] render the forty minute period of questioning entirely unnecessary, although I think the patience which it demonstrates is laudable.

The law is at least demonstrable, if not overwhelming, that a search of the respondent and a seizure of the pipe by these school officials would have been "reasonable" at any point after he had been seen in violation of the school prohibition against smoking; and use of any statements or evidence discovered in the process would have been admissable against respondent X in a consequent school disciplinary proceeding leading to sanctions for the infraction. *In re W.*, supra; *People v. Shipp,* supra. The instant appeal, however, is not from an in-school disciplinary proceeding [Compare *Tinker v. Des Moines Community School Dist.,* supra, where the school rule allegedly violated was, itself, held unconstitutional]; but rather from a finding of a criminal vio-

lation and an adjudication of delinquency under our Childrens Code.

After the forty minute period which resulted in respondent X's surrender of the pipe, the assistant principal here took the boy to his office, and there he and the school principal began to interrogate the boy for information about the origin and nature of the pipe's contents. This interrogation led to respondent X's confession that the substance in the pipe was marijuana.

In my opinion, the shift in emphasis between the first interrogation and the second marks the point in the facts presented at which the school officials lost their mantle of discretionary powers under the *in loco parentis* regulation, supra, because they took up an investigation of possible criminal violations with an eye to prosecution beyond the realm of school discipline. The boy then and there became entitled to the same treatment any adult would have enjoyed under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). I believe that it is incumbent upon the courts in general and upon this panel to draw the line between the activities of school officials performed in the place of the parent wherein wide latitude in permissible approaches should be the rule and activities performed by those same officials in the role of accuser, adverse to the interests of the child and wholly inconsistent with the role of protector implied by the *in loco parentis* doctrine. For that reason, I do hereby respectfully enter my dissent.

1. JURISDICTION OVER STUDENTS. Public school authorities, including school boards, administrators, teachers and others in positions where supervision of public school students is part of their responsibility shall stand "in loco parentis" with regard to those students during such times that they have the responsibility of supervising, instructing or otherwise controlling such students. During such periods public school authorities shall have the right of supervision and control over the conduct of such students.

This Regulation is intended to reflect the common law with regard to the rights, duties and liabilities of public school authorities in supervising, controlling and disciplining students and nothing herein shall be construed as enlarging the liability of public school authorities beyond that imposed by statute, common law or regulation of the State Board of Education. . . .